## SHELLMAR PRODUCTS CO. v. ALLEN-QUALLEY CO.

Circuit Court of Appeals, Seventh Circuit.
December 24, 1929.

Rehearing Denied January 29, 1930.

No. 4215.

John C. Slade, of Chicago, Ill., for appellant.

William H. Haight, of Chicago, Ill., for appellee.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

PAGE, Circuit Judge. Appellee was a manufacturer of confections at St. Paul, Minnesota, and appellant, with an office in Chicago, for some years before the matters here in question, printed candy bar wrappers for appellee and others.

In 1927, appellee devised a candy package wrap, consisting of two strips of material, called glassine, between which was glued a strip of transparent material, called cellophane. The contents of the wrap were visible through the cellophane, and that was a desirable feature. Because of its high cost, and for other reasons, no known transparent material for the whole wrap was satisfactory. Glassine, which is inexpensive and has all other qualities lacking in the cellophane, except transparency, made a satisfactory material for a wrap. Appellee devised the wrap and made a special machine for handling, gluing, and cutting the strips into proper lengths for use. Up to the time of the happening of the matters here in question, the time for which a patent could have been applied for upon the machine and/or the wrap had not expired. The wrap and the machine, until disclosed as hereinafter shown, remained a secret, unknown save to appellee and a few trusted employees. The machine was kept and operated in a locked room in appellee's factory.

The testimony is contradictory. The court found in favor of appellee upon all questions involved. The facts show fairly, we think, that, having business relations with appellant, the general manager of appellee, on November 25, 1927, went from St. Paul to Chicago to confer with appellant about its printing being done by appellant under existing contracts. During that visit the wrap was disclosed to appellant under a pledge of secrecy, for the purpose of considering arrangements for its manufacture. Nothing definite was done at that time. Just about that time, but whether before or after is not clear, one of appellant's officers called to see a patent attorney in Chicago, who was absent from the city.

On the morning of December 5th, two officers of appellant arrived at the office of appellee, in St. Paul, apparently for the sole purpose of taking up the question of obtaining the right, not only to print, but to manufacture, the wrap for appellee. The matter was discussed during December 5th and 6th. Appellant says that no arrangement was arrived at, but appellee says that a definite

agreement was reached, and that the absence of its counsel was the only reason the agreement was not then put in writing. Supporting appellee's contention is the fact that, at the request of appellant, appellee wrote and there delivered to appellant the following letter, viz:

"The Allen-Qualley Company hereby agreed to enter into a contract with the Shellmar Products Company, permitting them to manufacture the fabrication known as the 'Allen Look-In Ribbon Container Covering.' This contract shall embody the terms, royalties and conditions discussed and agreed upon this day.

"The Shellmar Products Company agrees to accept this contract and pay the Allen-Qualley Company $5,000 upon ratification of the above-mentioned agreement by both parties."

Here was a definite statement that the terms had been agreed upon, and it was not at that time, or at any time, until the witnesses went upon the stand, denied by anybody.

Immediately after appellant's officers received that letter, the machine devised and used by appellee to make the wraps was, under the pledge of secrecy, and because of the agreement, shown to appellant. Memorandum concerning the machine was made by one of appellant's officers. Directly after returning from St. Paul, appellant's officers, who had been there in conference, showed the wrap to one of its employees and described to him appellee's machine. He was directed to, and did, start at once to construct a machine for the purpose of manufacturing the wraps.

December 8th, appellee's attorneys wired from St. Paul to a firm of patent attorneys in Chicago, and said that appellee desired to consult them relative to securing a patent upon the wrap, and that they believed their friend, appellant, had perhaps consulted them in the same matter. Some communication, probably by telephone, passed between the Chicago attorneys and appellee's attorney, Bunn, and then one of the members of the Chicago firm, that appellant had not yet seen, called one of his partners and said, "It seems to me you have said something about such a company [meaning appellant];" and thereupon, when he was told that some one from appellant's office had called to see him some time before, at once got in touch with appellant's officers and discussed with them the matters then under consideration between appellant and appellee. By ar-

rangement then entered into, the attorney accepted a retainer from appellant of $1,000, which was paid then or upon the next day. It appears that, when the Chicago attorney got in touch with appellant and accepted its retainer after receipt of the telegram from appellee's attorneys, appellant then turned over the information which its officers had received in confidence from appellee, so that, acting upon that information, the attorneys, on the same day, sent a letter to their Washington correspondent, that enabled him to make an intelligent search, wherein he found and sent to the Chicago attorneys a copy of Olsen letters patent No. 1,640,052, "which appears to be infringed," his letter said. Appellant's attorney explains that by "infringed" was meant "infringed by appellee's wrapper." That letter was received on the 13th. On that same date, the Chicago attorneys got in touch with their correspondent in California, where the owner of the patent resided, and on the 14th there was purchased, for $1,000, the Olsen patent, copy of which was sent by their Washington correspondent to them on the 13th. It is this patent that the decree of the District Court directed appellant to assign to appellee. On December 13th, when the letter was received from Washington, and on the 14th, the day the patent was purchased, appellee's president and its attorney were in Chicago in conference with appellant's officers concerning the contract, and appellee's attorney and president were on one or both of those dates in the office of the Chicago attorneys discussing the question of a contract. It was not at that time or at any time disclosed to appellee that appellant had, in violation of the confidence reposed in it, disclosed the information given it by appellee or its attorneys, so that its attorneys were enabled to and did make a record search for patents that appellee's wrap would infringe. The fact that the Olsen patent had been purchased was not disclosed to appellee until five days thereafter.

These facts are in accordance with the findings of the District Court, are supported by the evidence, and, in our opinion, support the decree. We are of opinion that the fact that appellee had no patent, either upon its wrap or its machine, and the further fact, if it be true, that it may not have been entitled to a patent upon either, are unimportant in this case.

At the expense of considerable time and money, appellee had devised the wrap and the machine, and had manufactured the ma-

chine, and those two things were, at the time. the negotiations were commenced, secrets that belonged to it, and became known to appellant under the pledge of secrecy after the terms of the contract between the parties had been agreed upon. If appellee was not entitled to a patent upon either the wrap or the machine, it is probable that anyone who, by fair means, became possessed of sufficient knowledge to enable him to make the wrap might do so; but appellee had the right to keep its secret and to exact the pledge it exacted from appellant before making disclosures concerning the wrap and the machine. Appellant had no right to disclose that which it had received in confidence to its attorneys or to its workman, who was directed to make a machine for the purpose of injuring, or in such a manner as would injure, appellee, and appellant should, in equity and good conscience be required by the decree to put appellee, so far as possible, in the position it would have been in had the disclosures not been made to appellant. Whether it would have been possible to have discovered and purchased the Olsen patent, without the information disclosed to appellant in confidence, it is not necessary to determine, because it is clear from the record that by a breach of confidence the information was disclosed and used as a basis for the search that was made.

We see no way by which appellee can be fairly and adequately protected except by an affirmance of the decree.

Decree affirmed.

ALSCHULER, Circuit Judge. I concur in all save as to the disposition of the Olsen patent, which the decree directs appellant to assign to appellee on payment to appellant of $1,000 which it had paid for the patent. The effect of this (if the patent is valid and dominates appellee's wrap) would be to give appellee a patent monopoly which it never had. I believe that as to the patent the utmost appellant should have is assurance against disturbance or interference because of it, in its making and marketing the wrap, which was the subject-matter of the negotiations out of which this controversy arose. To this end I suggest the decree should provide that appellant, its agents, assigns, and licensees of or under the Olsen patent, be perpetually restrained from asserting the patent against appellee, its agents, assigns, manufacturers, jobbers and customers, in the making, marketing and selling and resale of its wrap, or in causing it to be made and sold. Such disposition, with the other provisions of the decree, would prevent appellant from making appellee's wrap, and at the same time protect appellee against interference by the patent, but otherwise leave appellant in the possession and control of the patent it had purchased.