## UTAH RADIO PRODUCTS CO. v. GENERAL MOTORS CORPORATION.
### No. 337.

Circuit Court of Appeals, Second Circuit.
July 31, 1939.

Drury W. Cooper and C. Blake Townsend, both of New York City, for appellant.

C. Paul Parker, Lincoln B. Smith, and Richard Russell Wolfe, all of Chicago, Ill., and Pennie, Davis, Marvin & Edmonds, of New York City, for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

This appeal is from an interlocutory decree of the District Court for the Western District of New York which held valid and infringed claims 1, 9, 10, and 11 of Patent No. 1,924,082, granted on August 28, 1933, to the plaintiff as the assignee of Edward L. Barrett, who filed his application as the inventor on January 3, 1933. The patent is for motor actuated circuit controlling means designed to interrupt the current flowing in an electrical circuit by alternately making and breaking the circuit in rapid succession. The patent covers simply the interrupting device although it is serviceable only in connection with the electric circuit. The patent is not confined to an interrupter suitable only for use with a radio receiving set of the kind found in automobiles but that was one of its intended uses and the one in which it seems to have been extensively employed.

Before describing how it works, it may be helpful to point out why it is useful in such a radio receiving set without reference to other uses to which it may be put. Such a set requires current both of low and of comparatively high voltage. The source of current supply is the usual six volt car battery which varies from below to above its normal rating as it becomes discharged or gets overcharged in operation. One way to obtain the necessary high voltage is to transform the battery current, which is always direct current, into alternating current; step that up to the high voltage desired; and then to turn it back to direct current which remains at the high voltage and is suitable for use in the receiving set where the current from the so-called "B" batteries was formerly used. Thus the patented device does in this field play an important part in connection with the accompanying electrical circuits and electrical devices in providing means for eliminating the need for "B" batteries in radio receiving sets.

The patented interrupter is what helps make the first change in the current from direct to alternating. It does this by breaking the direct current into a rapid succession of short surges which enter first one side and then the other side of the divided primary coil of the transformer. After that is done nothing covered by the patent in suit has to do with what happens to the current.

To accomplish this breaking up of the even flow of the direct current from the battery, Barrett employed a vibratory type of circuit interrupter similar in most respects to the old and well-known vibrating makers and breakers of electrical circuits found in buzzers or used to make door bells or telephone bells ring. He provided a casing of the right size and shape to enclose his interrupter and used that as a base to which to attach the parts to make them operate properly. When so attached and the two parts of the casing

were screwed together, the device could be installed wherever there was room for it. At one 'end of the casing which, because of the over-all shape of what it was to enclose was considerably longer than it was wide, was placed what is sometimes called a stack. In the middle of the stack was put one end of a flat spring which will be called the vibrator or reed. Insulation was placed on each side of this end of the reed. One end of a so-called spacing finger was put into the stack on either side of the vibrator and separated by insulation from each such spacing finger end were the ends of two side contact arms made of resilient metal. All these ends were held tightly in the stack by a bolt running through the center and a nut turned securely on the bolt. The vibrator, with a finger piece on either side of it and a side contact arm on either side outside the finger pieces, extended away from the stack all in the same direction with all their ends rigidly held in the stack as described. The fingers were the shortest and had their outer ends turned outwardly so that they would come into contact with the sides of the contact arms to limit their movement toward each other. Near their outer ends, the finger pieces were connected in rigid spaced relation to each other by a stud which ran through a hole in the vibrator at that point without touching the vibrator and left its freedom of movement unrestricted. A little farther out and about in the middle of the casing, the two contact arms ended and at the end of each was placed a contact point. Between those two points the vibrator passed back and forth in operation. Similar contact points were attached to it on either side so that as the vibrator moved toward first one and then the other of the contact arms these points would hit the corresponding points on the contact arms and an electrical circuit would be closed to allow direct current to surge for a brief time first into one side of the divided primary of the transformer and then into the other.

The remaining part of the device consists of what made the vibrator move from side to side. Being a flat spring held rigidly at one end it would be put under tension whenever its free end was moved out of normal position and would return toward normal position when the force which pulled it away ceased to be operative. This force was obtained by using the well known coil and core magnet with pole pieces just beyond the outer end of the vibrator to which was fitted a comparatively heavy armature that never could quite come into actual contact with either pole piece of the magnet and was offset enough so that when the magnet was energized the vibrator's end would be pulled out of its normal plane. This pull continued until the contact point on that side of the vibrator came into contact with the point on the contact arm on that side to close the circuit to permit direct current to surge into one side of the transformer primary. But as the closing of that circuit also served to shunt the current flowing to the magnet so that was deenergized, the spring action of the vibrator pulled it back toward and beyond its normal position and brought the contact point on the other side of the vibrator against the point on the arm on that side causing direct current to surge through to the other side of the primary of the transformer. This closing of that circuit, however, removed the short circuit of the magnet which at once was reenergized and pulled the armature on the vibrator back to close the first direct current circuit with all the consequences it had before. So a succession of the making and breaking of circuits followed with the resultant flow of direct current intermittently to the two separate sides of the transformer primary while the interrupter was permitted to operate.

There is but little of what has been described which differs at all from what was old. Certainly no part was by itself new nor did any part serve a purpose different from what it had before in some similar device. But it is claimed that they have been brought together to form a new combination in a way that required invention and brought about a new and better result. The novel features are said to consist of (1) open contacts when the interrupter is idle; (2) of the spacing of the armature away from the pole pieces of the magnet so that it will never hit them no matter how much of an overcharge there is in the battery; and (3) the vibrator not under tension when the device is not in use and so not under tension when it starts.

Claim one is the most comprehensive of those in suit and will serve to show what combination the plaintiff undertook to claim:

"1. A circuit making and breaking device comprising, in combination, an elon-

gated casing, an electromagnet mounted in one end of said casing and having pole faces located substantially in a plane transverse of said casing and facing toward the other end thereof, three spaced contacts mounted in the other end of said casing and extending toward said electromagnet, said contacts being formed of resilient material with the center one of said contacts extending to a point substantially adjacent to said pole faces, an armature carried by the end of the center contact for swinging movement past said pole faces, said armature being normally disposed eccentrically with respect to said pole faces so that energization of the electromagnet will produce movement of said armature and swing said center contact into circuit closing engagement with one of the outer contacts, the other of said outer contacts being engageable by said center contact upon a return movement thereof when the electromagnet is deenergized, said outer contacts being resiliently urged toward each other, and spacing fingers interposed between said outer contacts for abutment thereby to limit the inward movement thereof, the ends of said fingers being bent toward said outer contacts to provide a single point of engagement between a contact and its associated finger and to adjust the position of the outer contacts with respect to the center contact."

Although for one reason or another radio receiving sets in automobiles became much more numerous about the time this patent was issued, it is doubtful whether Barrett's circuit interrupter contributed much, if anything, to bring that about. It differed only in minor respects from what had previously been used for the same purpose. Prior use was adequately proved and was found as a fact by the trial judge. He held some claims invalid because of it but did not think it controlling as to the claims in suit.

In the so-called Karadio prior use the vibrator was a flat spring secured at one end to its casing and thereby held tightly as the stack did the end of the vibrator in the patented interrupter. This allowed the vibrator to move back and forth by spring action as that of the patent does. It is said to differ in not having the same rhythmic motion and perhaps that is true. But whether so or not depended upon the nature of the spring chosen for use. There would be no invention simply in the installation of the sort of spring that would give the required tension when deformed and further nothing in the patent turns specifically upon rhythmic motion of the sort some particular flat spring will provide instead of what will follow from the use of another. It had a comparatively heavy piece fastened to the outer end of the flat spring which served as an armature. Its magnet was at the side of the armature instead of at the end and the current to it went on and off in response to the movement of a normally closed magnet contact instead of being shunted by the normally open vibrator contacts but these alternative methods of energizing and deenergizing such a magnet had long been known and used. So too, normally open and normally closed contacts were well known and the use of one or the other was but a mechanic's choice. In Karadio, however, the armature did not pass the pole piece of the magnet and the contact points were carried by the armature in a way that put some tension upon the vibrator spring. But as soon as the Barrett vibrator was moved out of its normal position by the pull of the magnet it was also under tension and so the real difference in this respect is only the amount of tension which is obviously controllable by the mere selection of springs.

The trial judge was correct in his conclusion that the claims held valid did not read directly on the Karadio vibrator assembly. The passing armature of Barrett did away with the danger of chattering and the open contacts with burning if vibration did not begin as soon as the current went on. The Karadio construction was, therefore, improved though the rather slight changes made make it doubtful whether there was any inventive advance over Karadio.

Light is shed upon that by turning to the adequately proved prior use of the Lomax vibrator. That was not, as was Karadio, in use in the radio art in which the patent in suit has found its main outlet but was used for exactly the same purpose in respect to the transformation of direct current from a battery into alternating current to be raised to high voltage to ring a telephone bell. Barrett, after Karadio, was but following an indicated path to accomplish the necessary transformation of direct battery current to high voltage alternating current by improving the design of a disclosed operable device.

His object was to turn the direct current into alternating current whose voltage could be raised. So his device for doing the same thing Lomax did is in an analogous art. See Crown Cork & Seal Co. v. Sterling Cork & Seal Co., 6 Cir., 217 F. 381; Powers-Kennedy Contracting Corp., v. Concrete Mixing & Conveying Co., 282 U.S. 175, 51 S.Ct. 95, 75 L.Ed. 278.

Lomax had the flat spring vibrator fitted with a heavy armature. The armature was so placed in relation to the pole piece of the magnet that it would not hit that but would pass by if the pull of the magnet was strong enough. He placed the armature between the fixed end of the vibrator and the moveable contact points while Barrett had his moveable contact points between the two vibrator ends but the two constructions are, in this respect, too obviously equivalent to require further comment. Lomax also had a separate circuit to actuate his magnet which in turn was provided with a normally open contact which turned the current on and off the magnet coil as the circuit was made to close and allowed to open. He also employed normally-open contact points for permitting the direct current to surge alternately into one and then the other half of his transformer primary. In fact there seems to have been nothing so far to distinguish the Barrett construction from that of Lomax except that Lomax shorted his magnet coil by means of his separate contact while Barrett made use of his side contacts to shunt that current on and off. The choice of one or the other of two known methods was not invention. Aside from this immaterial difference in magnet circuit control Barrett left off a rod and a weight adjustable upon it which Lomax attached to his vibrator to control its frequency of vibration. The omission of such means for the control of the frequency of vibration by Barrett was merely to discard an unwanted part of Lomax together with the function it performed leaving the remaining elements to act as before and was not invention. Richards v. Chase Elevator Co., 159 U.S. 477, 16 S.Ct. 53, 40 L.Ed. 225. Nor did it require inventive thought to make the Lomax device in a smaller size Steel Stamping Co. v. N. H. Hill Brass Co., D.C., 17 F.Supp. 18; affirmed, 2 Cir., 86 F.2d 1013.

It is true that because the Lomax vibrator extended beyond the armature proper and beyond the pole piece of the magnet it would be a hammer type that could hit the pole piece, as the trial judge thought it actually was, if its scope of vibration toward the pole piece were in excess of the width of the armature for then the extension carrying the circuit contacts would hit the face of the pole piece. But the circuit contact on that side of the extension would previously close and prevent such excessive movement toward the magnet pole piece. Because the armature did, therefore, pass the pole piece and nothing else could come into contact with it, Lomax actually had a passing armature of the non-chattering type. Whether, if the Lomax vibrator were installed in a horizontal position, the pull of gravity would close one of the side circuit contacts would depend wholly upon the character of the spring used in the vibrator. If stiff enough to hold the side contacts open despite whatever force tending to close one of them would be encountered in whatever use to which the vibrator might be put, there would, of course, be no closure and the choice of the right spring to do that would not itself be a basis for a valid patent.

That passing armatures mounted on a vibrator or reed were themselves old is amply shown by Patent No. 345,720 granted to Parcelle July 20, 1886; and No. 1,671,245 granted to Kraus on May 29, 1928. The Karadio prior use left little that could be new in what Barrett disclosed and Lomax left nothing. Barrett therefore disclosed no invention and the claims in suit must accordingly be held invalid.

Some argument has been made to the effect that Barrett contrived to get an excess of magnet current from the battery to give so-called double voltage in that circuit by using the side circuit contacts to shunt the current on and off the magnet coil. If he did get that result it would also be obtained when anyone else used the same old method of making and breaking the magnet current. He said nothing about it in his specifications nor did he cover it in any of the claims in suit though claim 11 is relied on for that. It is but an afterthought not now of any consequence.

As we are of the opinion that all the claims in suit are invalid for the reasons stated, we do not pass upon any other matters in defense.

Decree reversed and bill dismissed.