SEISMOGRAPH SERVICE CORPORATION and Etienne Augustin Henri Honore, Plaintiffs,

v.

OFFSHORE RAYDIST, Inc., Defendant and Third-Party Plaintiff (HASTINGS INSTRUMENT COMPANY, Inc., Third-Party Defendant).

Civ. A. No. 3686.

United States District Court
E. D. Louisiana, New Orleans Division.

Sept. 29, 1955.

Malcolm L. Monroe, New Orleans, La., Richard Mason, M. Hudson Rathburn, Joseph L. Hull, Jr. (Mason, Kohlemainen, Rathburn & Wyss, Chicago, Ill., and Monroe & Lemann, New Orleans, La.), for plaintiffs.

John E. Hurley, New Orleans, La., John W. Malley and Allen Kirkpatrick, Washington, D. C., and Cushman, Darby & Cushman, Washington, D. C., for defendants.

WRIGHT, District Judge.

This patent litigation results from the quest for oil in the tidelands of the Gulf of Mexico. It concerns three patents, the Honore patent, No. 2,148,267, owned by the plaintiff Honore, and exclusively licensed in the geophysical field to the plaintiff Seismograph Service Corporation, the Hawkins patent, No. 2,513,316, owned by the plaintiff Seismograph Service Corporation, and the Hastings patent, No. 2,528,140, owned by the third-party defendant, Hastings Instrument Company. All three patents provide means of radio location of mobile craft through application of the heterodyne phase comparison principle.[1] The Honore patent

---

[1] The basic heterodyne principle applied by the patents in suit comprises essentially: (a) The transmission from spaced points of a pair of radio frequency signals which differ in frequency only by an audio or low frequency; (b) Heterodyning the two signals at two distinct points to produce low frequency beat notes; (c) Modulating the heterodyne note developed at one of the receivers on another radio frequency for transmission to and reproduction at the point of location of the other receiver; and (d) Comparing the two low frequency signals as to phase.

In the Honore patent a moving craft is provided with one of the two heterodyne receivers. The second heterodyne receiver is placed at a fixed point on the ground, and the two transmitters, each operating at slightly different radio frequencies, are also fixed on the ground at spaced apart points, usually a distance considerably greater than the wave lengths of the transmitter operating frequencies. In operation, if the mobile craft having the one receiver aboard is navigated along a path which is a hyperbola having the two transmitting stations as foci, no change in the phase angle between the beat frequencies is generated. It will be understood that suitable relay means are provided for conveying the beat frequency output of the fixed heterodyne receiver and the beat frequency output of the mobile receiver to a common point, whereat there are located a phase angle measuring device and a device for counting or integrating the total number of revolutions of the phase angle measuring device. This arrangement in effect not only main-

provides a radio location along a single hyperbolic line, whereas the Hastings

tains a count of the phasemeter cycles generated, but actually permits measurement of the instantaneous phase angle between the two beat frequencies delivered to the phase angle measuring device. If the craft is navigated along a hyperbolic line having the transmitting points as foci, the indication of the phase angle meter does not change. However, navigation of the craft laterally of the hyperbolic path causes a phasemeter change. Every time the craft moves laterally so that the difference in the distances from the craft to the respective transmitters increases or decreases by an amount equal to the transmitter operating wave lengths, the phasemeter makes a complete 360° cycle or revolution and begins again.

The counting arrangement is provided to resolve the ambiguities that would otherwise result. Briefly stated, while ambiguities are undesirable, nevertheless obviously greater accuracy can be obtained by permitting the phasemeter to revolve several times as the craft crosses the field covered by the transmissions.

The heterodyne receiver aboard the mobile craft continuously produces 360° cycles of beat frequency. These cycles are due to two factors: (1) the nonsynchronization of the transmitters per se, and (2) lateral movement of the craft from a hyperbolic path. That is, even if the craft be assumed stationary for purposes of analysis, the heterodyne receiver on the craft will produce a beat frequency equal to the difference in cycles per second between the radio transmissions. However, if the craft should move laterally, then while it is in motion the beat frequency output of the heterodyne receiver on the craft will change due to the fact that the craft is moving closer to one transmitting station and away from the other, thus changing the difference in distances thereto.

The function of the heterodyne receiver fixed in relation to the transmitters is to generate a reference or phase standard beat frequency which is attributable solely to the nonsynchronization of the transmitters. It does so because its physical relationship to the transmitters does not change. This standard or reference beat frequency is then relayed to the phase angle measuring device whereat a phase comparison is made between the relayed beat frequency and the beat frequency output of the heterodyne receiver aboard the mobile craft. The result is that the relayed beat frequency is matched to or applied against the beat frequency of the mobile heterodyne receiver in so far as the

beat frequency of the latter is due solely to transmitter nonsynchronization. This operation leaves as a residual component of beat frequency only that which is due to movement of the craft laterally from a hyperbolic line. The phasemeter shows only this residual component.

When the residual beat frequency (in other words, the number of revolutions of the phasemeter) in cycles per second caused by lateral movement of the craft is so slow that a long interval of time exists between repetitions of the phasemeter cycle, the concept of measuring the instantaneous phase angle between the beat frequencies applies, rather than the concept of counting the number of cycles or revolutions of the phase angle measuring device. If the craft is stationary at a given point and therefore is on one point of a hyperbolic line (the loci of points of equal differences in distance to the transmitting points), both of the beat frequencies—the one from the mobile heterodyne receiver and the one relayed from the fixed heterodyne receiver—are equal, and the phasemeter is stationary at a given reading. If the craft should be moved so as to change the differences in distance to the respective transmitting points, and again is made stationary at its new position, and assuming the change in the difference in distances is other than exactly one wave length of either of the transmitter frequencies, the beat frequencies will again be equal and the phase meter stationary, but the indicated phase angle will have changed an amount related to the movement of the craft in terms of the transmitter operating wave lengths. If the craft is started up and moves rapidly, so as to rapidly change the differences in distance, the phasemeter will be revolving rapidly and the concept of counting the revolutions, rather than measuring instantaneous phase angle, comes into play. The two beat frequencies applied to the phasemeter are "counter-rotating," and the phasemeter indicator dial moves only when a different speed exists between the two inputs.

A heterodyne phase comparison system as described above having only one pair of main transmitters and one pair of main receivers is "single-dimensional" in that only a line of position results. Such is the Honore patent. The Hawkins and Hastings patents in suit, by using a third primary transmitter, working alternately with the first two, first one and then the other, provide a second line of position crossing the first, thus the exact location of the moving craft is established.

and Hawkins patents, by using the same principle and substantially less than double the equipment used by Honore, provide a radio location, or fix, at the intersection of two hyperbolic lines.

Honore was patented in 1939 and there is no indication that the patent was ever used for any purpose prior to the incidents in suit. The patent became important in 1947 when the ascertainment of the exact locations of vessels conjointly performing geophysical work in the tidelands became necessary, and the young inventor Hastings, applying the heterodyne phase comparison principle and without being aware of the existence of the Honore patent, proposed the use of crossed hyperbolic lines, obtained through emissions from radio transmitters on shore to radio receivers in vessels afloat, to provide the exact locations of the vessels. Applications for the Hawkins and Hastings patents were filed shortly after the Hastings proposal.

Plaintiffs Honore and Seismograph filed the original complaint in this case against Offshore Raydist, Inc., for infringement of Claims 2 and 4 of the Honore and Claims 2 and 14 of the Hawkins patent. Hastings Instrument Company, the manufacturer of the alleged infringing equipment and a 50 per cent stockholder in Offshore Raydist, was made a third-party defendant. It has asserted claims against the Seismograph Service Corporation, alleging an equitable interest in the Honore and Hawkins patents by virtue of a breach of a constructive trust by Seismograph, and further alleging infringement by Seismograph of Claims 1, 2, 8 and 9 of the Hastings patent.

The issues for decision concern the validity of Claims 2 and 4 of the Honore patent and their alleged infringement by Offshore Raydist, the validity of Claims 2 and 14 of the Hawkins patent and their alleged infringement by Offshore Raydist, the alleged infringement by Seismograph of Claims 1, 2, 8 and 9 of the Hastings patent, mutual defenses of laches filed by both Seismograph and Hastings, and most important of all, whether or not a relationship existed between Seismograph and Hastings which imposed a constructive trust on Seismograph for the benefit of Hastings with respect to the Honore and Hawkins patents, or either of them.

The story of this case begins in 1947 after the oil industry became aware of the vast reserves of oil in the tidelands of the Gulf of Mexico. The geophysical work in connection with this oil exploration had to be conducted on vessels afloat in the Gulf of Mexico. The exact location of the shooting vessels which detonate the dynamite and the recording vessels which record the earth's reverberations and reaction to the explosions had to be established, and the oil industry had found no means therefor. The industry, through its geophysical contractors such as the plaintiff Seismograph Service Corporation, experimented with Shoran, Radar, and Decca, all methods of radio location, but none of sufficient accuracy to justify its use in geophysical work.

Phillips Petroleum Company, the principal client of the plaintiff Seismograph, had learned from Dr. Kenneth Norton of the United States Bureau of Standards that the young inventor Hastings had done considerable work in radio location involving the heterodyne phase comparison principle and that perhaps Hastings would have a solution to its problem of exact radio location of vessels working offshore. Hastings, an electronic engineer, had been employed by the National Advisory Committee for Aeronautics for a period of years. His work there had to do with providing means for tracking the flight of aircraft by radio, using the heterodyne phase comparison principle. A detailed 1943 N.A.C.A. report prepared by Hastings while so employed described this principle.

In April, 1946, Hastings had left the employ of N.A.C.A. and was conducting a small private business known as the Hastings Instrument Company, Inc., housed in his home in Hampton, Virginia. By this time, Hastings had conceived and described in his records vari-

ous versions of his radio location system which he now called "Raydist." In June of 1946, Hastings prepared an outline entitled "The Application of Raydist in Measuring Angles of Pitch and Roll," as related to airplanes or guided missiles in flight, which he forwarded to the Navy Department. In addition to describing a two-dimensional system,[2] based on the heterodyne phase comparison principle, this outline explained how two or more beat frequencies[3] from heterodyne phase comparison systems can be modulated upon a common carrier as is described and claimed in the Hawkins patent in suit.

By April, 1947, when technically qualified representatives of Phillips called on him at his home at Hampton, Virginia, Hastings was able to demonstrate two versions of his Raydist system, the single user, or moving transmitter type, and the multi-user, or fixed transmitter type. Phillips representatives were interested in the multi-user type since they were interested in obtaining the location of several vessels doing geophysical work at the same time. By the simple expedient of placing heterodyne receivers in the vessels and the transmitters on shore, a saturable system became nonsaturable. The Phillips representatives were elated with what they saw. They definitely felt that Hastings had a solution to their offshore survey problem. After obtaining approval from the management of their company, the Phillips representatives called on Dr. Hawkins, officer and director of Seismograph. They advised Hawkins of their visit to Hampton, Virginia, and explained in detail what they saw and heard there. Hawkins was advised of the Raydist system and its potential use in offshore surveying. He was told not only that the use of a basic Raydist system would produce a hyperbolic line of position but that by using what amounted to two basic Raydist systems conjointly, a definite radio location, or fix, could be obtained by crossed hyperbolic lines.

Hawkins, an electronic engineer who had been making fruitless efforts using other systems such as Shoran, Radar, and Decca to obtain exact radio location of vessels working offshore, immediately grasped the significance of the Hastings disclosures as related by Phillips representatives. It was the first time that Hawkins or anyone connected with Seismograph had learned that the heterodyne phase comparison principle could be used to solve the problem of exact radio location, for which solution its principal client, Phillips, was pressing. Working feverishly, by May 11, 1947, Hawkins was able to produce a duplicate of the equipment, and the demonstration, which Hastings had shown the Phillips representatives some days earlier. Having been advised by the Phillips representatives of the modest circumstances under which Hastings' business was being conducted from his home, and the further fact that obviously Hastings' patent position on his Raydist system was poor, Hawkins immediately forwarded to his patent counsel in Chicago disclosures for patent applications covering the Raydist systems and variations thereof.

Shortly before May 15, 1947, and at the request of Seismograph, a meeting with Hastings was arranged for the purpose of allowing Seismograph an opportunity further to investigate Hastings' Raydist systems to determine their applicability to Phillips' offshore exploration problem. On May 15, 1947, the Executive Vice-President of Seismograph, a geophysical engineer, went to Virginia and met with Hastings. At this meeting Hastings again described his Raydist systems, as previously disclosed to Phillips. Manhart proposed a business arrangement with the Hastings Instrument Company wherein Hastings would supply complete Raydist systems and would grant license rights to Seis-

2. A system providing a fix by crossing hyperbolic lines.

3. Low frequency notes obtained by heterodyning signals from transmitters emitting on slightly different frequencies.

mograph. Upon Manhart's return to Seismograph's principal office at Tulsa, Oklahoma, he reported to the other officers of Seismograph all disclosures made to him by Hastings. In addition to disclosures of a technical nature, he reported that the Hastings company was financially weak, that Hastings was inexperienced in business matters, and that the Hastings patent position was probably poor. On May 23, 1947, after securing the approval of the Executive Committee of Seismograph, Manhart wrote to Hastings formally proposing the formation of a joint venture between Hastings and Seismograph and outlining the details of the joint arrangement, including the provisions that Hastings would supply the engineering design of the system for the company and that Seismograph would supply any applicable patent rights which it might obtain on the subject. Manhart in his letter asked Hastings to come to Tulsa empowered to act on the joint venture which he proposed.

Hastings visited Seismograph in Tulsa on June 16, 17 and 18, 1947. Hastings discussed with Hawkins and Westby, President of Seismograph, the joint venture proposed in Manhart's letter of May 23rd. Hastings also disclosed in detail a two-dimensional crossed hyperbola system using only three fixed transmitters and a switching principle on the transmitters wherein to conserve radio carrier frequencies. Hastings gave Hawkins and Seismograph the benefit of all his knowledge, experience and research on the Raydist systems and their practical operation, including the multiple modulation technique which is the subject of the Hawkins patent in suit. Hastings supplied this information to Seismograph with the understanding that the information imparted was for the benefit of and in furtherance of the joint venture which was under consideration. During these meetings in Tulsa on June 16, 17 and 18, Hastings was not advised by Hawkins or anyone connected with Seismograph that Hawkins had already prepared for filing a series of patent applications covering the Hastings

Raydist systems and variations thereof. During these talks with Hawkins, Hastings disclosed that there was a significant patent which anticipated his Raydist system and that rights in that patent would have to be acquired. He did not, however, divulge to Hawkins the name or number of the patent, stating that he, Hastings, had already opened negotiations for such patent rights. The patent Hastings referred to was the Honore patent, owned by the plaintiff, Mr. E. A. H. Honore of Paris, France.

Hastings continued to cooperate with Seismograph throughout the months of June, July, August and September of 1947 in the joint business venture which Seismograph had proposed. Seismograph, on the other hand, unknown to Hastings, during this time was attempting to develop a Raydist system of its own suitable for use in offshore surveying, and by the end of July had made such progress in that endeavor that the management of Seismograph determined to advise Hastings that there would be no joint venture. Hawkins, who called Hastings by telephone for the purpose of so advising him, learned in the conversation that a competitor to Seismograph was making inquiries concerning the Raydist system. Hawkins thereupon determined not to advise Hastings of the decision to terminate the joint venture negotiations, and reported his conversation with Hastings to Seismograph's management.

Thereafter, in spite of the fact that a final decision had already been reached to terminate the joint venture negotiations, and in order to gain time to perfect its patent position and to complete the development of its own system based on Raydist, Seismograph, through its officers, particularly its president, Westby, and Hawkins, continued to delude Hastings with the promise of a joint venture. In fact, Westby actually told Hastings he had scheduled, and had Hastings prepare for, a demonstration of a two-dimensional Raydist system for Phillips representatives on September 8, 1947. This demonstration was cancelled by

Westby by telegram to Hastings reading, "Due Unexpected Important Trip By Client's Representative, Unable Be There For Demonstration Monday. Will Inform You Later Suitable Date." The evidence shows that no Phillips representative was ever advised of the scheduled demonstration. Moreover, the Phillips representatives testified that there was no need for further demonstration, that they were satisfied by the first demonstration that Raydist was the answer to their problem. The telegram was the last communication from Westby to Hastings. Hastings did not hear from him, or other representatives of Seismograph, again, in spite of repeated efforts on his part to reach them by telephone.

During the months the joint venture negotiations were being conducted, Seismograph was active, unknown to Hastings, in building a patent position which would dominate his Raydist system. It acquired rights in various patents pertinent to Raydist which would block its development by anyone other than Seismograph. In particular, Seismograph was interested in obtaining rights in the Honore patent to which Hastings had referred, without disclosing its name, as being basic to his Raydist system. Hawkins advised Mason, Seismograph's patent counsel in Chicago, of Hastings' reference to this patent and directed that every effort be made to identify it so that rights thereunder could be acquired. For reasons best known to himself, Hawkins also advised Mason of the name of Hastings' patent counsel in Washington. The manner in which the Honore patent was identified as the one in which Hastings was interested forms a very sordid part of this case.

Mason engaged the services of a Washington associate, one Bailey, to make a search in the Patent Office in the hope of identifying the patent to which Hastings had referred. He gave his associate all the reports and other information necessary to acquaint him fully with the Raydist system together with his recommendations to Seismograph with reference to dominating this system. He informed his associate of the status of Seismograph's relations with Hastings, of Hastings' interest in the prior patent covering the heterodyne feature of Raydist, and of the fact that Hastings was negotiating to secure rights in that patent. He advised his associate of the identity of the Washington patent firm representing Hastings.

Mason's associate, Bailey, acting for Seismograph, contacted an employee of the Hastings Washington patent counsel who was then making a validity search at the Patent Office on a patent pertaining to radio navigation systems. Without disclosing to this employee his interest or intentions, Bailey was able, by deception, misrepresentation and concealment, actively directed by Mason, to learn from him that Honore was the patent in which Hastings was attempting to acquire an interest. Mason congratulated Bailey on his excellent work, and on August 25, 1947 reported in full to Hawkins on the action which had been taken at the Patent Office to determine Hastings' interest in the Honore patent, and advised Hawkins that "The Honore patent is definitely the patent in which they (Hastings) are interested." [4]

Immediately upon receipt of this information, Seismograph moved quickly to obtain exclusive rights in the Honore patent. On August 26, 1947, Mason dispatched an urgent and confidential letter to Paris to locate Honore. The general counsel of Seismograph wrote its London representative, advising him that the matter of obtaining rights in the Honore patent was extremely urgent because of the fear that someone else in the geo-

---

4. In a pretrial deposition, Hawkins denied that, in October, 1947, when Seismograph obtained rights under the Honore patent, he was aware that it was the patent in which Hastings was interested. Subsequent to the taking of the deposi-tion, the court ordered Seismograph to produce its correspondence with its patent counsel, Mason. Mason's letter of August 25, 1947, was one of the documents produced.

physical field was currently endeavoring to purchase rights in that patent. Finally, early in October, Hawkins flew to Europe and negotiated and obtained for Seismograph exclusive rights in the geophysical field under the Honore patent. It is these rights, so obtained, together with Seismograph's rights under the Hawkins patent, which Seismograph has brought this suit to enforce.

The elusive concept of patentable novelty or invention stands at the threshhold of every patent application. Unless it tends "to promote the Progress of Science and useful Arts," it does not meet the standard of invention set up in the Constitution itself. U.S.Const. art. 1, § 8. And it is the Supreme Court which is the final authority on that Constitutional standard. Great Atlantic & Pacific Tea Co. v. Supermarket Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162.[5] Mr. Justice Bradley, in Atlantic Works v. Brady, 107 U.S. 192, 200, 2 S.Ct. 225, 231, 27 L.Ed. 438, wrote:

"The design of the patent laws is to reward those who make some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts. Such inventors are worthy of all favor. It was never the object of those laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures. Such an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention. It creates a class of speculative schemers who make it their business to watch the advancing wave of improvement, and gather its foam in the form of patented monopolies, which enable them to lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the arts. It embarrasses the honest pursuit of business with fears and apprehensions of concealed liens and unknown liabilities to lawsuits and vexatious accountings for profits made in good faith."

In spite of the insistence on the part of the courts that this constitutional standard be met before a patent monopoly is recognized, the Patent Office has continued to patent "every trifling device, every shadow of a shade of an idea" which is presented to it. Atlantic Works v. Brady, supra. See Great Atlantic & Pacific Tea Co. v. Supermarket Corp., supra, 340 U.S. at pages 156–158, 71 S.Ct. 127.

The Congress has now in the Patent Act of 1952, 35 U.S.C.A. § 1 et seq., sought to define a standard of patentability. Title 35 U.S.C. § 103 reads in part: "A patent may not be obtained * * * if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. * * *" This standard of patentability is apparently an effort to state in statutory form what the Supreme Court has held in many cases.[6] If it is an effort, as has been suggested,[7] to reduce the standard of in-

5. Concurring opinion.

6. Sinclair Co. v. Interchemical Corp., 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644; Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 90, 62 S.Ct. 37, 86 L.Ed. 58; Honolulu Oil Corp. v. Halliburton, 306 U.S. 550, 59 S. Ct. 662, 83 L.Ed. 980; Saranac Automatic Machine Corp. v. Wirebounds Patents Co., 282 U.S. 704, 51 S.Ct. 232, 75 L.Ed. 634; Morris v. McMillin, 112 U.S. 244, 5 S.Ct. 218, 28 L.Ed. 702; Phillips v. Detroit, 111 U.S. 604, 4 S.Ct. 580, 28 L.Ed. 532; Slawson v. Grand Street P. P. & F. R. Co., 107 U.S. 649, 2 S.Ct. 663, 27 L.Ed. 576; Hicks v. Kelsey, 18 Wall 670, 85 U.S. 670, 21 L.Ed. 852.

7. Lyon v. Bausch & Lomb, 2 Cir., 224 F. 2d 530.

vention as recognized by the Supreme Court, then that effort must fail for the reason that the Supreme Court is the final authority on the constitutional standard of patentability.

The presumption of validity attends the grant of a patent, and the burden of persuasion of invalidity is on the putative infringer. Radio Corp. of America v. Radio Engineering Laboratories, 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163; 35 U.S.C. § 282. This presumption is strengthened where it appears the Patent Office has considered and distinguished the prior art relied on as anticipation. Southern States Equip. Corp. v. USCO Power Equip. Corp., 5 Cir., 209 F.2d 111. A felt need for, acceptance and utility of a process or device is evidence of its patentability. Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721; Diamond Rubber Co. of New York v. Consol. Tire Co., 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527; Landis Mach. Co. v. Parker-Kalon Corp., 2 Cir., 190 F.2d 543. A process patent is one which outlines a method or means of producing a physical result independent of the producing mechanism. Honolulu Oil Corp. v. Halliburton, supra. To be patentable, it is not necessary that the device or process be broadly or generically new. It is sufficient if its novelty is but an improvement on a prior patent, in which event patent rights thereunder are strictly limited to its precise form and elements. Diamond Rubber Co. of New York v. Consol. Tire Co., supra; 35 U.S.C. § 101. A device or process composed of elements of the prior art is patentable if the combination produces a new and useful result. Leeds & Catlin v. Victor Talking Mach. Co., 213 U.S. 301, 29 S.Ct. 494, 53 L.Ed. 805; Jeoffroy Mfg., Inc., v. Graham, 5 Cir., 219 F.2d 511; Robertson Rock Bit Co. v. Hughes Tool Co., 5 Cir., 176 F.2d 783. Honore is a process and combination patent, while Hawkins and Hastings are improvement patents.

The Honore patent [8] has not only never been used commercially prior to the incidents in suit, but there is no indication that the process outlined therein has ever been even demonstrated. So far as this record shows, prior to the time Hastings developed his Raydist system, the Honore patent was just another piece of paper cluttering the Patent Office. The application was filed at a time when there was interest in radio beacons, but no interest in, or demand for, radio location systems of limited range. Actually, Honore intended that his invention be used as a radio beacon supplying a line of position. The possibility of crossing two lines of position to obtain a fix did not occur to him.

The heterodyne phase comparison feature of Honore is anticipated in the

8. Claims 2 and 4 of the Honore patent, which are the claims in suit, read:
"2. A method for radioelectrically indicating the difference in the distance between a point of reception and two distinct transmission points, consisting in simultaneously emitting a pair of carrier waves of different frequencies respectively from said two distinct transmission points, one of said frequencies differing from the other frequency by a low frequency, obtaining by interference a combination of a radio frequency with said low frequency by means of the step consisting of superimposing said different frequencies upon one another, emitting a supplementary carrier wave having a frequency markedly different from said interfering frequencies, so as to constitute another combination of a radio frequency with said low frequency by modulating with said low frequency the said supplementary carrier wave, obtaining from said combinations two currents of the same low frequency but differing in phase, and comparing the phase of said two currents.
"4. A radioelectric transmitter comprising three aerials, two of which are separated by a definite distance, means to supply said two aerials respectively by two high frequencies slightly different, means to supply the third aerial with a high frequency markedly different, a local receiver for collecting the emissions of the two first aerials, said receiver comprising means for mixing and detecting said emissions in order to collect in the receiver output a current of a frequency equal to the difference of their frequencies and means to modulate by this current the emission from the third aerial."

## 352

Evans and Greig patent,[9] a radio beacon system, which patent is substantially similar to Honore in all respects with the exception that Honore calls for spaced transmitters, thus providing a hyperbolic, rather than a straight, line of position.[10]

■ In the hyperbolic art, Honore was anticipated by many patents,[11] particularly Morrill.[12] What Honore did was to combine certain previously disclosed parts of the heterodyne phase comparison art with certain previously disclosed parts of the hyperbolic phase comparison art to produce an apparently useless paper patent. Nevertheless, it cannot be said with assurance that what Honore did was so plainly indicated by the prior art that his invention would be obvious to a person having ordinary skill in the electronic art. Moreover, Honore's combination of old elements did produce a new and, as Hastings subsequently proved, useful result in the hyperbolic art. His patent eliminated the necessity for synchronizing the spaced transmitters while maintaining the accuracy provided by the use of high frequencies. The validity of the claims in suit of this patent, therefore, must be conceded.

■ With reference to the Hawkins patent in suit, a different result must be reached. In the first place, Hawkins was not the inventor thereof. Alexander Milburn Co. v. Davis-Bournonville Co., 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651; 35 U.S.C. § 102(f). It was Hastings who conceived the idea of a double Honore system using only three spaced transmitters. This idea was conveyed to the Phillips representatives and by them to Hawkins, who appropriated it as his own. As to that part of Claims 2[13] and 14[14] which relates to a means for modulating multiple beat frequency signals upon a common carrier, that, too, was described by Hastings, in 1946, in his application of his Raydist system to the angles of pitch and roll in airplanes or guided missiles, long before the Hawkins patent was applied for. Hastings made no claim to have invented multiple modulation. As an electronic engineer,

9. Patent 1,933,248, Evans & Greig, Oct. 31, 1933.

10. The patent application of Honore was first rejected by the Patent Office because it was readable on, or equivalent to, British Patent No. 385,521 to Aga-Baltic, 1932, which patent is only remotely related to Honore. It appears that the Patent Office examiner did not realize initially that Honore called for spaced transmitters providing a hyperbolic line of position. When this feature of Honore was called to his attention, he approved the application without considering the prior hyperbolic art.

11. Patent No. 941,565, Fessenden, Nov. 30, 1909; Patent No. 1,562,485, Affel, Nov. 24, 1925; Patent No. 546,000, Harms, Mar. 8, 1932; Patent No. 1,998,834, Englund, Apr. 23, 1935; Patent No. 2,050,276, Chubb, Aug. 11, 1936; Patent No. 2,083,945, Evans, June 15, 1937.

12. Patent No. 1,406,996, Morrill, Feb. 21, 1922.

13. Claim 2 of the Hawkins patent reads: "2. In a position determining system, three spaced transmitters for radiating continuous waves of different frequencies, means for heterodyning the waves radiated from a first and second of said transmitters to develop a first signal having a frequency equal to the difference frequency between the waves radiated by said first and second transmitters and for heterodyning the waves radiated from the second and third of said transmitters to develop a second signal having a frequency equal to the difference frequency between the waves radiated by said second and third transmitters, and means for modulating said first and second signals upon a common carrier wave for space radiation."

14. Claim 14 of the Hawkins patent reads: "14. In a position determining system, three spaced transmitters for radiating continuous waves of different frequencies, means for heterodyning said waves to produce distinguishable signals having frequencies respectively equal to the difference frequencies between different pairs of said waves, a link transmitter for radiating a carrier wave at a frequency distinguishable from the different frequencies of said continuous waves, and means for modulating at least two of said signals upon said carrier wave for space radiation."

he was familiar with the process. So was Hawkins. Apparently it was unfamiliar to Hawkins' patent counsel, so he had it patented. That the idea of modulating multiple audible frequencies on a common carrier was not new to workers in the art is shown by the Patent Office records. It was disclosed at the time, not only in the radio navigation art,[15] but in related arts as well.[16] Applying an idea from an analogous art is not invention. Powers-Kennedy Contracting Corp. v. Concrete Mixing & Conveying Co., 282 U.S. 175, 51 S.Ct. 95, 75 L.Ed. 278; Utah Radio Products Co. v. General Motors Corp., 2 Cir., 106 F.2d 5. To recognize a patent for this minuscule contribution, which Hawkins did not make, to the promotion of "the Progress of Science and useful Arts" would "lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the arts." Atlantic Works v. Brady, supra, 107 U.S. at page 200, 2 S.Ct. at page 231.

The validity of the Hastings patent is unchallenged. The failure of Seismograph in this regard is obviously a tactical maneuver designed to avoid an invidious comparison with the position it has taken with reference to the validity of the Hawkins patent. Assuming, therefore, that the Hastings patent is valid, it is not infringed by Seismograph's Lorac system. If the Hastings patent made any contribution to the promotion of science and the useful arts, it is so limited in scope that its claims must be held within a very narrow compass. Although originally claiming infringement of Claims 1, 2, 8 and 9, only

infringement as to Claim 1 [17] is now being pressed. That claim primarily relates to the so-called switching principle by which the transmitters in the Raydist system are used alternately, thus reducing the system's frequency allocation requirements. The Lorac system, while making use of the switching principle, does not respond to Claim 1 of the Hastings patent for the reason that it does not include any "means for alternately operating said first and second transmitters." The measure of the patent is the claim. Motion Picture Patents Co. v. Universal Film Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871; White v. Dunbar, 119 U.S. 47, 7 S.Ct. 72, 30 L.Ed. 303. Since Lorac does not respond to that claim, there can be no infringement unless equivalency has been established.

The doctrine of equivalents prevents frauds on patents by subtle copyists. It is unavailing to Hastings because of the limited scope in which his patent must operate. Equivalency must be predicated on the specifications and claims of the patent, the prior art and the particular circumstances of the case. Graver Tank & Mfg. Co. v. Linde Co., 339 U.S. 605, 609, 70 S.Ct. 854, 94 L.Ed. 1097. It relates primarily to basic patents whose specifications support the broad claims made for them. Unless it is shown that plain mechanical or electrical equivalents have been substituted for one or more of the elements claimed, it has no application where, as here, a well-known principle is applied in an improvement patent in an art closely related to arts in which the principle is already widely used. Getty v. Kinzbach Tool Co.,

15. Patent No. 2,141,282, Southworth, Dec. 27, 1938.

16. Patent No. 1,361,488, Osborne, Dec. 7, 1920; Patent No. 1,444,605, Heising, Feb. 6, 1923; Patent No. 1,447,204, Espenschied, Mar. 6, 1923; Patent No. 1,-690,227, Heising, Nov. 6, 1928.

17. Claim 1 of the Hastings patent reads: "1. A two dimensional navigation system comprising a first transmitter, a second transmitter and a reference transmitter, means for alternately operating said first and second transmitters, means for comparing the phase of the beats between said reference transmitter and said first transmitter as received at a first point with respect to the phase of the beats between the same transmitters as received at a second point, and a means for comparing the phases of the beats between the reference transmitter and said second transmitter as received at said first point with respect to the phase of the beats between the same transmitters as received at a second point."

5 Cir., 119 F.2d 249; Texas Rubber & Specialty Corp. v. D. & M. Machine Works, 5 Cir., 81 F.2d 206. See Powers-Kennedy Contracting Corp. v. Concrete Mixing & Conveying Co., supra; Utah Radio Products Co. v. General Motors Corp., supra. There has been no such showing. The application of the switching principle in Lorac differs from the use made of that principle in the Hastings patent in at least four particulars, all involving more than mere mechanical or electrical equivalents.[18]

 The importance of the equitable issues in this case transcends the interest of the parties. "* * * The far-reaching social and economic consequences of a patent, * * * give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct * * *." Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co., 324 U.S. 806, 816, 65 S.Ct. 993, 998, 89 L.Ed. 1381. The robber baron morality of another day is no longer acceptable. Courts are insisting on increasingly higher standards of commercial integrity. Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co., supra; Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293; Franke v. Wiltschek, 2 Cir., 209 F.2d 493, 499; Allen-Qualley Co. v. Shellmar Products Co., D.C., 31 F.2d 293, affirmed 7 Cir., 36 F.2d 623; Id., 7 Cir., 87 F.2d 104. It has been long recognized that any patent obtained through fraud and dishonest dealings is unenforceable in a court of equity. Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co., supra; Keystone Driller Co. v. General Excavator Co., supra; Pomeroy's Equity Jurisprudence, 5th Ed., §§ 385, 397, 401, 402a. Now business information or trade secrets, not rising to the stature of invention, are protected. Franke v. Wiltschek, supra; Smith v. Dravo Corp., 7 Cir., 203 F.2d 369; Id., 7 Cir., 208 F.2d 388; Schreyer v. Casco Products Corp., 2 Cir., 190 F.2d 921; Matarese v. Moore-McCormack Lines, 2 Cir., 158 F.2d 631, 170 A.L.R. 440; Chesapeake & Ohio Ry. Co. v. Kaltenbach, 4 Cir., 95 F.2d 801; Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912; Allen-Qualley Co. v. Shellmar Products Co., supra; Booth v. Stutz Motor Car Co., 7 Cir., 24 F.2d 415; Id., 7 Cir., 56 F.2d 962. The fact that the business information is otherwise available is no defense. The improper acquisition itself creates the liability in damages. Franke v. Wiltschek, supra; Smith v. Dravo Corp., supra; Vulcan Detinning Co. v. American Can Co., 72 N.J.Eq. 387, 67 A. 339, 12 L.R.A.,N.S., 102; Tabor v. Hoffman, 118 N.Y. 30, 23 N.E. 12. "One who, for the purpose of advancing a rival business interest, procures by improper means information about another's business is liable to the other for the harm caused by his possession, disclosure or use of the information." Restatement of the Law of Torts, § 759.[19]

 Even where it cannot be said that the parties stand in confidential relations, improper acquisition of another's business information or trade secrets subjects the perpetrator to liability in damages. Restatement of the Law of Torts, §§ 757, 759. And a court of equity will enjoin the use of the business information or trade secrets so obtained. Franke v. Wiltschek, supra; Smith v. Dravo Corp., supra; Allen-Qualley v. Shellmar, supra. No single test can be applied in all cases where improper acquisition of business information is charged. The inventiveness of the devious mind staggers the imagination. It

18. Lorac does not respond to Claim 1 of Hastings in the following particulars: (1) Lorac has no "means for alternately operating said first and second transmitters," (2) Lorac does not employ a low frequency modulation for switching purposes, (3) Lorac does not utilize a carrier wave which is common to the two paths of signals to be compared, and (4) Lorac does not require a separate link transmitter.

19. See, also, Restatement of the Law of Torts, § 757.

is simply the difference between right and wrong, honesty and dishonesty, which is the touchstone in an issue of this kind.

In April, 1947, Hastings owned business information and trade secrets [20] which Seismograph badly needed. Seismograph's principal client, Phillips Petroleum Company, was pressing Seismograph for solution of the radio location problem involved in offshore surveying. Experiments by Seismograph with other radio location systems had failed, and Phillips' technical representatives, after studying the Hastings system, advised Seismograph that Hastings had, what appeared to them to be, the answer to their problem. They advised Seismograph further that Hastings should be consulted. Instead of going to Hastings as upright business men, Seismograph determined to steal his work. Hawkins, an officer and director of Seismograph, on learning from the Phillips representatives the details of the Raydist system, immediately applied for patents on the system and variations thereon in the hope that inexperienced and impecunious Hastings had not already done so. But Seismograph did not stop there. It sent its executive vice-president to Virginia to learn more of Hastings' secrets and to offer him a brave plan by which they would form a joint venture to exploit the system. The brave plan was even reduced to writing and presented to Hastings for his consideration. Seismograph invited Hastings to its home office, further to pick his brains and milk him of the information on Raydist he had been so long acquiring.

During the time Seismograph was deluding Hastings with the offer of a joint venture, its own technicians, led by Hawkins, were perfecting their own version of the Raydist system based on the information Hastings had given them. By August 1, 1947, Seismograph felt it had no longer any use for Hastings, having obtained all the information it needed. Still it held the lure of joint venture before his eyes, so that he would not give his information to Seismograph's competitor, Offshore Navigation, and so that it, Seismograph, would have time to perfect its patent position, with particular reference to the Honore patent. Seismograph's president, Westby, even conjured up a fake demonstration, and had Hastings prepare equipment for the demonstration, for Phillips representatives who were never even advised that a demonstration was to take place. Indeed. Seismograph even stooped to espionage on Hastings' patent counsel.

Thus it was that Seismograph was able to perfect its Raydist system which it called Lorac.[21] Thus it was that Seismograph was able to obtain exclusive rights in the Honore patent on which unwittingly Hastings had based his system. And now Seismograph has the effrontery to come into a court of equity to ask that its patents, so obtained, be used to enjoin the work of the very man who gave them life.

The unclean hands and fraudulent conduct of Seismograph has been established by a long and expensive trial.

---

20. The business information and trade secrets which Seismograph improperly acquired from Hastings include the following: (a) that Hastings had a small and poorly financed business; (b) the status of his pending patent application, and the fact that he had not filed applications on the surveying application on "Raydist"; (c) information on a significant background patent (Honore) which he was then negotiating for; (d) technical information on the surveying or fixed transmitter application of the heterodyne phase comparison principle; (e) information on the two-dimensional fixed transmitter system; (f) information on his switching principle; and (g) other detailed technical information.

21. Westby, Seismograph's president, testified that he was unable to explain why Seismograph's system was called Lorac. An effort to insinuate a connection with world famous "Loran" is the probable answer.

This court, therefore, must dismiss the complaint in so far as it relates to the plaintiff Seismograph and require Seismograph to award the Hastings Instrument Company a sublicense in the geophysical field, covering the vendees of its equipment, on the Honore patent, retroactive from the time the rights thereunder were acquired by Seismograph. Hastings will pay Honore royalties on the same basis as Seismograph.[22] The Hawkins patent has been declared invalid herein. If its validity had been established, this court would have awarded a royalty free license to Hastings Instrument Company and the vendees of its equipment. The authority of a court of equity to formulate a decree of this kind is recognized in many cases. Franke v. Wiltschek, supra; Smith v. Dravo Corp., supra; Saco-Lowell Shops v. Reynolds, 4 Cir., 141 F.2d 587; Hoeltke v. C. M. Kemp Mfg. Co., supra; Baker Oil Tools v. Burch, 10 Cir., 71 F.2d 31; Allen-Qualley Co. v. Shellmar Products Co., supra; National Wire Bound Box Co. v. Healy, 7 Cir., 189 F. 49. By virtue of this decree, Seismograph and Offshore Raydist may go forth into free competition, unfettered by the heavy hand of monopoly. In this way, not only will the wrong done Hastings be righted, but the oil industry, and indirectly the public itself, will not be relegated to the tender mercies of a monopolist.

█ The mutual defenses of laches are without merit. With reference to Seismograph, its unclean hands bars it from asserting the equitable defense of laches. Laches on the part of the plaintiffs has not been established. The record shows that shortly after Offshore Raydist commenced using the Raydist system commercially, this action was brought. There was no obligation to institute the action before that time.

Decree accordingly. No damages and no attorney fees.

22. $10 per receiving station in use per month.