263 F.2d 5
 119 U.S.P.Q. 146, 119 U.S.P.Q. 452,
120 U.S.P.Q. 244
 SEISMOGRAPH SERVICE CORPORATION, Appellant,
v.
OFFSHORE RAYDIST, Inc., and Hastings Instrument Company,
Inc., Appellees (two cases).
OFFSHORE RAYDIST, Inc., and Hastings Instrument Company,
Inc., Cross-Appellants,
v.
SEISMOGRAPH SERVICE CORPORATION, Cross-Appellee.
 Nos. 16067, 16924.
 United States Court of Appeals Fifth Circuit.
 Oct. 17, 1958, Rehearing Denied Dec. 9, 1958, Opinion On
Petition for Rehearing Feb. 3, 1959, Second
Petition for Rehearing Denied April 22, 1959.
 
 Joseph Lumpkin Hull, Jr., Tulsa, Okl., Richard D. Mason, M. Hundson Rathburn, Chicago, Ill., for plaintiff-appellant, Mason, Kolehmainen, Rathburn & Wyss, Chicago, Ill., Monroe & Lemann, Malcolm L. Monroe, Walter J. Suthon, Jr., New Orleans, La., of counsel.
 John E. Hurley, New Orleans, La., for Offshore Raydist, Inc. and Hastings Instrument Ci., Inc., appellees and cross-appellants, John W. Malley, Allen Kirk-patrick, Cushman, Darby & Cushman, Washington, D.C., of counsel.
 Before RIVES, JONES and BROWN, Circuit Judges.
 RIVES, Circuit Judge.
 
 
 1
 Seismograph Service Corporation and Honore (who is not a party to these appeals) sought to enjoin Offshore Raydist Company and its privies from infringing the Honore Patent, 2,148,267, and the Hawkins Patent, 2,513,316. The Hastings Instrument Company, Inc. was brought in as a third-party defendant, and filed a cross action against Seismograph. After extensive pre-trial proceedings and depositions and a trial lasting more than half a month, followed by the submission of briefs, the district court expressed its findings of fact and conclusions of law in a full opinion,[1] as permitted by Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A., followed by a judgment dismissing Seismograph's complaint and holding:
 
 
 2
 (1) Claims 2 and 4 of the Honore Patent valid. From that holding neither party has appealed.
 
 
 3
 (2) Claims 2 and 14 of the Hawkins Patent invalid because, among other grounds, the patentee was not the real inventor.
 
 
 4
 (3) That relief for infringement of the Honore Patent should be denied on the ground of unclean hands of Seismograph.
 
 
 5
 (4) Granting, on equitable grounds, to Hastings Instrument Company and its vendees a sublicense in the geophysical field under the Honore Patent. That part of the decree is moot for the future because the Honore Patent has now expired.
 
 
 6
 (5) The validity of the Hastings Patent No. 2,528,240, brought forward in the cross-complaint was not attacked in the district court, but the court held that Seismograph had not infringed that patent. Neither party appealed from that holding.
 
 
 7
 (6) Denying all further relief to Hastings Instrument Company.
 
 
 8
 Thus, this appeal does not involve the validity of either the Honore Patent or the Hastings Patent.
 
 
 9
 Seismograph in its brief urges that the opinion of the district court
 
 
 10
 'will shock the senses of propriety and justice of anyone having knowledge of the facts involved. From only a cursory reading of the opinion, it will be obvious that the decision was influenced by deep prejudice against this Appellant and its individual representatives and assumes the existence of improper motives and intentions that are not supported by the evidence. At no point in this opinion does there appear an impartial recitation of the evidence upon which the Court bases its conclusions. Significant and decisive evidence is completely ignored, some of which is so conclusive of certain issues that its omission is not explainable.'
 
 
 11
 In another part of its brief, Seismograph charges the district judge with an 'accommodating correction of this obviously false statement' on the part of the witness Hastings. A careful study of the record in connection with the briefs and oral argument has convinced us that these intemperate charges against the district judge are wholly unfounded and improper.
 
 
 12
 In legally attempting to sustain its attack upon the judgment, the appellant states that the preponderance of the probative evidence was documentary and that our review of such evidence under the 'clearly erroneous' doctrine of Rule 52(a) approaches a review clear of any presumption in favor of the trial court, citing Galena Oaks Corp. v. Scofield, 5 Cir., 1954, 218 F.2d 217, 218, and Stewart-Warner Corp. v. Lone Star Gas Co., 5 Cir., 1952, 195 F.2d 645, 647, 648. Appellant further says that the evidence, both verbal and documentary, also shows the trial judge to be clearly erroneous in his decision. While much of the documentary evidence relied upon by appellant is comprised of ex parte memoranda and notes, and while the language of the trial court is severe to the point of blistering the appellant's conduct, we find that the trial court's findings of fact are not clearly erroneous under Rule 52(a) but are supported by substantial evidence and that there is no evidence of prejudice and bias (preconceived or otherwise) on the part of the trial judge.
 
 
 13
 We state the facts briefly and chronologically with emphasis on documentary evidence. It is to be noted that the time in which most of the pertinent facts occurred is from May to October of 1947. For reference purposes, the principal characters in this suit are identified in the margin.[2]
 
 
 14
 The appellant, Seismograph Service Corporation, is engaged primarily in rendering professional consulting services to the petroleum industry in the field of geophysical prospecting. Phillips Petroleum Corporation is one of its largest clients. The appellee third-party defendant, Hastings Instrument Company, Inc., is a small corporation dealing with experimentation and development in the field of radio, having as its principal officer and stockholder Charles E. Hastings. The Hastings Instrument Company, Inc., owns one-half of the stock in the primary defendant, Offshore Raydist, Inc.
 
 
 15
 The radio survey system, which is the subject of this litigation relates to the science of radio navigation and tracking in which the position of an object (whether on land, sea, or air) is accurately determined by an arrangement of transmitters and receivers of high frequency radio waves. The principle involved is called the heterodyne phase comparison principle which is discussed somewhat in detail in the margin.[3] The heterodyne phase comparison system was disclosed first by a Frenchman, one Etienne Augustin Henri Honore. Honore patented this principle in 1935 in the French patent No. 790,386 and in 1939 in the United States patent No. 2,148,267. The heterodyne phase comparison system disclosed by Honore has only one pair of primary transmitters and one pair of primary receivers and is called a 'single-dimensional' system, which gives only a one line-position which is, of course, inadequate for point detection. For clarification purposes, we should point out that by using a third primary transmitter (or an extra pair of transmitters), a second line-position may be established and point detection is given where these two line-positions intersect. This is the 'two-dimensional' system. Both the systems in suit (the Hawkins-Lorac and the Hastings-Raydist) are essentially this 'two-dimensional' type with all three of the primary transmitters in multiple modulation and also 'fixed' or stationary, with the pair of primary receivers being 'moveable' or located in the object to be tracked. In other words, the ship or vehicle does its own plotting. With fixed transmitters in a multi-dimensional field, it is possible to track more than one object in the field, where the moving transmitter can track only one object. The system disclosed by Hastings in the R-19 Bulletin as developed by him during the war used the moving transmitter. But regardless of whether the transmitter is moving or fixed, if the system uses a third transmitter (or an extra pair of transmitters) so as to get two line-positions, it is essentially a double Honore system or a double heterodyne phase comparison system.
 
 
 16
 Shortly after World War II, the petroleum industry's interest in oil exploration in the offshore areas of the Gulf of Mexico became acute. Small vessels would explore a given area by setting of sub-marine or underwater explosions and recording the effects of these blasts. If the exact geographical location of these explosions (or of the vessel in question) could be determined, then, by comparing their recorded effects, a complete oil field or area could be platted. Accuracy was the problem, and prior to 1947 the systems in operation, namely, Loran, Shoran, Radar, and Decca, were ineffective once the ship was out of sight of shore.
 
 
 17
 This problem was solved by the parties to this suit through the heterodyne phase comparison principle, and the facts as to how they solved this problem will determine the outcome of this litigation.
 
 
 18
 Charles E. Hastings was employed during the war years by the National Advisory Committee for Aeronautics. He then designed a heterodyne phase comparison system for radio navigation and tracking which used a 'moving transmitter' and was called 'Raydist.' Once this information was declassified and made public, Hastings assimilated his work and published it in a pamphlet called Bulletin R-19. He discussed the commercial aspects of this subject in an address to members of the Institute of Aeronautical Science in January 1947, wherein he also distributed copies of Bulletin R-19.
 
 
 19
 In the middle of March 1947, Dr. R. G. Piety, head of geophysical research for Phillips Petroleum Company, attended a convention of the Institute of Radio Engineers in New York and there discussed the problems of radio navigation with Dr. Kenneth Norton, a scientist in the National Bureau of Standards and one of the country's leading experts on radio propagation theory. Dr. Norton informed Dr. Piety that the recent development of Hastings', called Raydist, was the simplest and most accurate system so far developed for radio navigation and surveying. Dr. Norton thereafter sent Piety a letter thoroughly describing Raydist, and, in late March informed Hastings of the possible interest of Phillips Petroleum in Raydist for offshore Gulf operations. Hastings then wrote Piety about Norton's visit, stating that Raydist was accurate over water, and included a R-19 Bulletin and volunteered to give any other information on this subject.
 
 
 20
 On April 28, Dr. Piety and Dr. R. D. Snow (Phillips' patent technician) visited Hastings at his office in Hampton, Virginia, and there were given a demonstration of a Raydist two-dimensional system which consisted of two fixed transmitters with the receiving set in a moving auto. The experiment was completely successful, the automobile being tracked within the accuracy of a few feet. An office memorandum by Piety and Snow about this visit stated that Raydist was the answer to their problem; that, heretofore, Hastings had concerned himself with tracking aircraft (with the airplane containing the transmitter as described in Bulletin R-19), but by using fixed transmitter stations, a large area of water could be surveyed accurately; that Hastings was a small company; that Hastings had had one patent application refused and now had one ready to file; and recommended that Phillips should negotiate to buy one surveying outfit and order others. This memorandum shows that Hastings gave vital, technical, patent, and business information to Phillips upon solicitation by Phillips.
 
 
 21
 Four days after this visit (May 2), Phillips Petroleum decided in a conference that since all of Phillips' geophysical prospecting work was being handled by Seismograph, 'if Phillips were to buy a Raydist installation, it would very probably be turned over to the Seismograph Service Company * * * (and) that Seismograph Service Company be advised of the Raydist method and of Phillips' interest in the use of such a method and apparatus and if Seismograph Service Company is interested they should then negotiate directly with Hastings Instrument Company.' On the day after this decision, Piety and Hintze (head of geophysical exploration of Phillips) visited the office of Seismograph in Tulsa, Oklahoma, and discussed the Raydist system with G. H. Westby (President of Seismograph) and Dr. J.E. Hawkins (vicepresident in charge of research and development).
 
 
 22
 The evidence is conflicting as to the extent and scope of information about Raydist which was divulged to Westby and Hawkins by Phillips' officers. Dr. Hawkins emphatically insisted that the discussion was limited to Hastings' 'demonstration of the heterodyne principle of a single-dimensional system where a moving transmitter was moved between two fixed receiving stations * * *,' which was the system discussed in Bulletin R-19. But the preponderance of other evidence indicates, as the trial court found, that Phillips' officers divulged and discussed the two-dimensional fixed transmitter system which was the basis of Hastings' demonstration, and which is the heart of the 'idea' in this case. Piety's testimony corroborated this finding when he stated that, 'everything that would have been of interest to them (Seimograph) or pertinent to a description of the system would have been given to them' and further stated, 'We described the demonstration.'
 
 
 23
 About this same time, May 5th, Hastings' patent counsel in Washington had determined that the Honore patent No. 2,148,267 would be infringed by Raydist, and was attempting to locate the whereabouts of Honore so as to obtain either a license or an assignment of his patent.
 
 
 24
 Within seven days after learning of the potentialities of the two-dimensional fixed transmitter system in the heterodyne principle, explained to him by Piety and Hintze, Dr. Hawkins on May 11th roughly designed and demonstrated a two-dimensional fixed transmitter system. This design and demonstration was generally the same as the demonstration performed by Hastings for the Phillips officers and relayed to Hawkins. By the next day (May 12th), Hawkins sketched these discoveries and several variations thereof and had them notarized and on May 13th sent them with an explanatory letter to Richard D. Mason, Seismograph's patent counsel in Chicago, for him to determine patentability. It is interesting to note that one of these disclosures was the same as the Honore patent (the single-dimensional system), and one disclosure was a sketch of a two-dimensional system using three transmitters which was substantially the design of the fixed transmitter system demonstrated to Piety and Snow by Hastings. In this special delivery letter to Mason, Hawkins stated:
 
 
 25
 'I am enclosing five disclosures relative to position determination by means of the heterodyne principle. If you will docket these as you suggested and study them over, we will get together as to what we will do with them after our visit to the Hastings people in Washington.'
 
 
 26
 On the same day, May 13th, Hawkins left for Washington to participate in a 'council of war' with Mr. T.A. Manhart. Executive Vice-President of Seismograph, to decide the strategy of Seismograph's future relations with Hastings. While Hawkins and Manhart were in Washington, Manhart telephoned Presdent Westby in Tulsa on May 14th to repost on their progress. Portions of this conversation are as follows:
 
 
 27
 'M: Jerry, we've had kind of a council of war here and decided against Jim (Hawkins) going down to see these boys. It appears that the damned patent situation is too hot to fuss with them. This morning Jim has talked to Mason and he suggests that the most we can do is try to get an option from them for geophysical prospecting purposes for 90 days. In that time find out whether we need anything. The boys are not a damned bit sure they need anything from these fellows. So I think we'll proceed on that basis * * *.
 
 
 28
 'W: Well, the only thing I was thinking we might get from those boys that might save us a lot of time would be that receiver.
 
 
 29
 'M: I'll go down and talk to them, but they sure don't want me to get involved with them, and I'm not even going out to see their place, but have them come into Norfolk and talk there.
 
 
 30
 'W: Well, that's all right.
 
 
 31
 'M: We'd like to get the receiver, all right, but Jim says he can build a receiver without too damned much trouble. He thought it was about a $250 to $500 job.
 
 
 32
 'M: I am representing myself as not technically competent to talk to them. Able to talk to them about business arrangements but I don't know anything about this end of it, which I don't actually. I can be fairly honest on that part. This is pretty exciting, Jerry. Here it is in our laps for a damned small consideration to do all the things we planned to do and make a big splash at it.
 
 
 33
 'W: Well, I was just as excited as you are Tom. after I rode up and down in that car.
 
 
 34
 'M: Well, Jim is 'hot' and all of us are just as excited as can be and we don't want to get our neck out. Now, I think probably in general we are safe enough to go ahead with the damned thing and continuously follow our patent position, to where we are, and make whatever arrangements we have to as we go. But, Jim thinks he is clear enough hust from his talk with Dick (Mason) and with his own ideas, to proceed with it at the present time and not worry about it but I think that ought to be watched pretty carefully.
 
 
 35
 'M: So, we'll have to play it pretty cautiously but I think we can go ahead and get something started pretty rapidly. This is standard stuff, as represented to me, except a little phase counter and stuff Jim says you can get ahold of.
 
 
 36
 'W: Yeah, that's the way I understand it.
 
 
 37
 'M: Well, okay, I wanted to just see where-- whether you had any different ideas. We just got all of it together here and decided we wouldn't go see them on a technical basis.
 
 
 38
 'W: I think that's smart.
 
 
 39
 'M: And we might try to make an option arrangement with them-- a 90-day option for geophysical work application and go very little further unless this receiver thing became possible quickly. Okay, Jerry, that seems about all.'
 
 
 40
 Pursuant to their plans, Manhart visited Hastings the next day, May 15th, in Norfolk and represented to Hastings that he was technically competent. Whether or not Manhart's Masters degree in geological engineering and his prior experience with Seismograph refutes his claim of lack of technical qualification to understand the subject matter is purely speculative. During this meeting, Manhart proposed a business deal to use Raydist for electronic survey on the Gulf coast, which 'would give S.S.C. the exclusive right to exploit the seismic field in the industry.' Seismograph proposed to pay to Hastings a reasonable cost, plus manufacturer's profit on equipment purchase, plus a running royalty if Hastings would furnish patent protection on this equipment. Hastings then quoted a price of $50,000.00 per complete unit for five total units, but Manhart suggested an arrangement whereby Seismograph would pay Hastings a basic charge per month and an 8% running royalty per receiver. There was no discussion of technical information during this meeting, but Manhart stated in his report that Hastings had a primary 'application in on the heterodyne principle as related to surveying,' but he 'would guess that their patent position is poor although they are now making some additional applications.' In a brief memorandum of the meeting, Manhart stated that 'this deal was left, I think, in a satisfactory position and will be discussed further with them in the next week or ten days when we have become better acquainted with many features of the patents which exist in this field.'[4]
 
 
 41
 On May 17th, two days after Manhart's visit, Seismograph's patent counsel, Mason, advised Hawkins not to contract with Hastings because of the patent situation. Hawkins testified:
 
 
 42
 'A. (Hawkins) As a result of discussion with Mr. Mason, and advice from Mr. Mason, and advised not to go into a deal with Mr. Hastings, in view of the possible patent situation.
 
 
 43
 'Q. And when were you so advised? A. I was first advised of that in Chicago on the Saturday following May 15, 1947.
 
 
 44
 'Q. You were advised not to go into a deal with Mr. Hastings in May because of the patent situation, is that correct? A. I was advised to thoroughly investigate the patent situation and to be very careful of any such deal.
 
 
 45
 'Q. And when did you notify Hastings that you wouldn't go into such a deal because of the patent situation? A. I did not.
 
 
 46
 'Q. When did Seismograph advise him? A. I do not know.
 
 
 47
 'Q. Do you know of anyone who did advise him of that? A. I do not.
 
 
 48
 'Q. And you do know that Seismograph was working with Hastings as late as early September, is that true? A. No, sir.
 
 
 49
 'Q. Weren't they working with Hastings in arranging demonstrations for a client, as late as early September? A. We were asking Mr. Hastings to postpone the demonstration for a time.
 
 
 50
 'Q. As late as September? A. That is correct.'
 
 
 51
 Approximately one week later on May 23rd, Manhart wrote Hastings stating that, since the time element was of such extreme importance, he would propose a meeting in order to accomplish the creation of a joint corporation where Hastings Instrument Company would be given a percentage of the stock for equipment, engineering design, and license right under their patents and would receive a royalty per receiving combination purchased by the joint-company. Manhart stated that this enterprise would be contingent on a satisfactory engineering design, a satisfactory patent situation, and a successful allocation of frequencies by the Federal Communications Commission.
 
 
 52
 On May 31st, Hawkins recorded some more disclosures or conceptions which were chiefly variations and extensions on his original theme of a two-phase fixed transmitter system , and one of these disclosures was the basis for the Hawkins-patent-in-suit. At the same time, Hastings' patent counsel had contacted Honore in Paris and cabled that 'Honore accepts principle non exclusive license with three percent royalty but considers proposed 1947 minimum somewhat low.' While Hastings was thus negotiating with Honore, Mason was making an extensive patent search for Seismograph the heterodyne principle. Mason answered an interrogatory to the effect that he 'located' the Honore-patent between June 2-5, but upon an examination of the documents in question,[5] it appears that Mason did not 'determine' the importance of the Honore patent until July 8th.
 
 
 53
 The meeting between the officers of Seismograph and Hastings, as proposed by Manhart on May 23, occurred on June 16-18 in Tulsa. During the two and one-half days of Hastings' visit, the parties extensively discussed the application of the heterodyne phase comparison system, discussed generally the patent problem whereby Hawkins disclosed to Hastings that Seismograph was investigating the patent field and Hastings confessed that he believed 'only one patent would be infringed other than our own, and that we had a tentative agreement with the owner of this patent.' Tentative data and plans for a new joint corporation were drawn up and Hastings was to 'arrange a two-dimensional demonstration of the Raydist at the earliest possible opportunity.' The meeting ended with the agreement that a decision was to be made within twenty days on whether or not they would form their joint corporation. this time was allegedly needed by Seismograph to terminate one qay or anotherits prior negotiations with a British company for the use of Decca. Within that twenty days Hastings was free to do as he liked. However, during this three-day meeting, it appears that Seismograph's officers were not reciprocating the good faith disclosures of Hastings. In this respect, Hawkins testified as to their work on radio navigation:
 
 
 54
 'Q. Now, when he described that to you, did you tell him that you were doing any work along these lines? A. No, sir.
 
 
 55
 'Q. That is, this R-53 exhibit No. 24 (sent later to Hawkins) represents what Hastings told you? A. Yes, sir.
 
 
 56
 'Q. But you had been doing work along these lines before he came down there and you told him nothing about what you had done? A. I told him nothing of what we had done.' Hawkins testified with respect to his disclosures sent to Mason:
 
 
 57
 'Q. And you refrained from telling him anything about any of them? A. I felt under no obligation to tell him what we had been doing.
 
 
 58
 'Q. You felt under those circumstances, then, it was all right for you to listen but not divulge what you had been doing? A. That is correct.' Hawkins testified with respect to Hastings' statement about the 'significant prior patent':
 
 
 59
 'Q. When he mentioned this significant patent at your meeting in Tulsa, did you understand that it had some application to this surveying system of defendant's Exhibit 24, which had been the basis of your discussions? A. Yes, I believe so.
 
 
 60
 'Q. And the new corporation to be formed was to use this Raydist system of Exhibit 24, is that correct? A. I believe so.
 
 
 61
 'Q. Therefore that patent was understood to have a significance with respect to the operation of the new company is that correct? A. I would think so.
 
 
 62
 'Q. And you understood he was negotiating for rights under the patent in order that they would be available for this new company, is that correct? A. Yes, that he would include them in the contribution.'
 
 
 63
 The memorandum R-53, which is referred to above as Exhibit 24, was dated June 26, 1957, and was Hastings' research memorandum on the 'complete two-dimensional navigational system for the Gulf of Mexico area' which was a detailed analysis of the Raydist system as pertaining to the problems sought to be solved by Seismograph and was the basis of the joint undertaking discussed at the Tulsa meeting. This research memorandum was mailed to Hawkins shortly after June 26, and he promptly sent it to Mason in Chicago. Furthermore, the evidence clearly shows that the disclosures of memorandum R-53 were attempted to be patented by Hawkins as late as August 13. In a letter from Mason to Hawkins concerning this, Mason states:
 
 
 64
 'In the opening sentence of your memorandum describing Figs. 26 and 27, you state that, 'you propose to use the system shown in Fig. 26.' This statement gives me some concern inasmuch as there is nothing in the art ahead of Hastings which will prevent his obtaining claims broad enough to dominate your Figs. 26 and 27 disclosures. Broadly, the switching concept in combination with the compensating feature inherent in the Hastings system is disclosed in Hastings' research memorandum No. R-53 dated June 26, 1947. If Hastings is or has been diligent in filing an application disclosing the switching system referred to in this memorandum, or alternatively has been diligent in reducing this system to practice and later files an application, it seems to me that he should obtain claims broad enough to cover the different arrangements disclosed by your Figs. 26 and 27.'
 
 
 65
 Within two days after the Tulsa meeting, Hawkins wrote Mason a letter which included the following postscript:
 
 
 66
 'P.S. Hastings told me that his attorney had advised him not to reveal the heterodyne patent that they were aware of. However, he assured me that it was not in Class 250 and that he would be glad to let us have all the patent information as son as we entered into a negotiating agreement. The firm representing Hastings is Cushman, Darby and Cushman, American Security Building, Washington, D.C.' Answering this postscript on June 26, Mason wrote:
 
 
 67
 '* * * First, it occurs to me that the infringement question should be determined with reference to the system which you most likely will use, namely the Raydist System, modified to include stationary transmitters, movable receiving equipment aboard the mobile craft, and phase modulation of one of the two transmitters to get the difference frequency between the two transmitted carriers back to the receiving equipment on the moble craft. Is this a correct description of the system which you will most likely use if your deal with Hastings goes through?
 
 
 68
 'Incidentally, I have not located the patent which Hastings states is giving him trouble from an infringement standpoint * * * I simply cannot understand how a patent containing claims broad enough to read upon the Hastings, i.e., the Raydist, System, would not at least be crossreferenced into sub class 11 of Class 250 * * *. At the same time, I can understand the reluctance of Hastings to give you information of the patent number since he has no assurance that you might not rush in and attempt to make a better deal with the patent owner, other than the fact that you look like an 'honest feller.' In any event if, as and when you get information on this patent which I should have located, please pass the same along so that we can have a look at the patent.'
 
 
 69
 Following through the steps outlined at the Tulsa meeting, Hastings checked of F.C.C. clearance and on June 20 wrote Hawkins that the situation with the F.C.C. was excellent. Hawkins answered this letter on the 24th of June expressing satisfaction about the good news of F.C.C. and stated that it looked as though the Decca deal was falling through and that Manhart was to check on Decca within the week.
 
 
 70
 During the first week in July, Hastings was still negotiating with Honore for patent rights, and Mason had discovered the Honore patent, concluding on July 8 that it contained claims which would be infringed upon by the Raydist System. On July 19 Honore wrote Hastings' attorney that he had made other advances on the patent and that, if an exclusive license were given, he (Honore) would like to come to the United States, expenses paid, to negotiate. On July 11, Mr. Carlson, Seismograph's general counsel, got in touch with the Office of Alien Property and obtained information on how to locate and negotiate with Honore, ascertaining that Honore was the true owner. On July 15 in a letter to Mason, Hawkins enclosed the 'latest correspondence from Hastings re Radyist' and stated, 'For your information, we received yesterday from Miss Bonini the copies of patent by Honore, Fletcher and Brunner which you requested she send us.' Also during this period of relative calm, Hastings sent to several oil companies a copy of an article entitled 'Raydist-- A Radio Navigation and Tracking System' published in the June issue of Tele Tech magazine.
 
 
 71
 On July 22, Mason made his exhaustive and technical patent report to Hawkins, in which he went into detail on the Honore, Fletcher and Brunner Patents. Mason concluded this report by suggesting they obyain at least non-exclusive licenses from the Honore and Brunner Patents. We will quote from passages of this report and supplementary report:
 
 
 72
 'I am still worried about the patent which Hastings advises he is interested in. I feel sure that Honore and Brunner are not the patents he has in mind * * *.
 
 
 73
 'Except for Hastings' statements, I would feel certain that we now have the important patents well in hand and that we know where we stand and how to proceed. Certain benefits of this investigation are clear, vis.:
 
 
 74
 '1. We now know that Hastings cannot dominate the field and hence cannot peddle his system at a premium on the theory that his patent position will prevent others from supplying equipment operating on the same principles.
 
 
 75
 '3. We know that use of the Hastings' system is fraught with patent infringement difficulties and how to avoid such difficulties.
 
 
 76
 '6. The possibilities of S.S.C. creating a reasonably good patent situation in the field are clearly indicated.'
 
 
 77
 'This report will supplement our report of even date herewith dealing specifically with the Hastings or Raydist radio survey system * * *. As I advised you by telephone, I can see no reason why we should give such collaborators the benefit of all of the work which we have done on this project. * * *
 
 
 78
 'The above discussion suggests that it might be possible to obtain a dominating paten situation on the so-called 'Raydist' or Hastings system by purchasing exclusive rights (by assignment or exclusive license) under the Honore and Brunner patents, * * *. I feel strongly that if you entertain any ideas of buying up the Brunner and Honore patents to create a patent situation on the so-called Raydist or Hastings system, alond the lines suggested above, you should not divulge your knowledge of the Brunner and Honore patents to anyone and particularly not to Hastings. On the contrary, we should make every attempt to obtain from Hastings information regarding the particular patent in respect to which he is now negotiating for license rights * * *.'
 
 
 79
 On the same date as the above report, Mason commissioned Bailey (a patent researchist in Washington) to continue the search for the 'missing patent,' stating the following confidential information:
 
 
 80
 'However, S.S.C. has been dickering with Hastings Instrument Company of Hampton, Va., with the view of purchasing a system like Fig. 2 of the report from Hastings. Hastings has advised that they are dickering for an exclusive license under a patent covering the above-mentioned heterodyning feature. They (Hastings) won't give us the number of the patent, but state that it is misclassified and is not in Class 250 * * *.
 
 
 81
 'This is important and rush and the enclosed reportes are at the moment, highly confidential. Please send same back with your report. Incidentally, I understand Cushman, Darby and Cushman are representing Hastings.'
 
 
 82
 Less than two weeks after the Tulsa meeting, the officers of Seismograph held a policy discussion concerning the radio survey system and, in an inter-company memorandum dated July 30, outlined the following procedure:
 
 
 83
 'General:
 
 
 84
 '1. S.S.C. will reject the Decca proposal for the reasons outlined in Hawkins' memo on Decca, dated July 29, 1947.
 
 
 85
 '2. S.S.C. will reject the Hastings proposal for the following reasons:
 
 
 86
 'a. The apparent poor patent position of the Hastings Instrument Company on the radio system.
 
 
 87
 'b. It is considered that the Hastings Company is not so far along in development but what SSC can catch up.
 
 
 88
 'c. SSC does not consider it advisable to spend money on patent protection for a joint company in which it owns only a partial interest. 'Patents:
 
 
 89
 'With regard to patents it is SSC's desire to obtain primarily a souldn operating position, and secondarily an exclusive patent position in the radio survey field. To accomplish these objects, the follwing procedure is being adopted:
 
 
 90
 '1. SSC will attempt to obtain a non-exclusive, exclusive license or purchase of the Honore Patent No. 2,148,267.' Thus, we see that on July 29 Hastings Instrument Company was dropped out of the picture and unilaterally assumed the status of an undisclosed enemy instead of an open fried.
 
 
 91
 On July 30, Bailey in Washington made a brief report about his research on the 'missing patent' to Mason and in this report stated that he became acquainted with a Mr. Timbie who was doing the electronics work for Hastings' firm (Cushman, Darby & Cushman). Mason answered on August 1, stating, 'also, if Mr. Timbie is given to conversation, it might not hurt to show him the Holmes Patent (not Honore of Brunner) and ask him if that is the patent he is interested in.' In a report of August 7, Bailey stated:
 
 
 92
 'With regard to your suggestion that I show the Holmes patent to Mr. Timbie, I have been waiting for the proper opportunity to present itself inasmuch as our prior conversation was somewhat spontaneous, and to bring up the subject again would indicate to him my interest in finding out his patent. If the opportunity should occur, I shall let you know the result immediately.'However, on August 11, Bailey found the right 'opportunity' with Timbie and upon discussion of the 'navigation art' Timbie discussed the Honore patent and Bailey concluded, 'In any event, it established the fact that Hastings is aware of the Honore patent.'[6]
 
 
 93
 On August 1, the day after the Seismograph people had decided ostensibly to abandon Hastings, Hawkins telephoned Hastings with the interntion of verbally rejecting any proposal to form a joint company but, upon first inquiring of Hastings' patent situation, Hastings stated, 'we are expecting a tie-up momentarily on the only patent we think is important.' Hastings further told Hawkins tha Offshore Navigation Company was interested in Raydist bur that Hastings advised them that 'he cannot consider a proposition until he fully considers his present negotiations.' Hawkins then led Hastings on by discussing the terms of the fictitious joint corporation. In Hawkins' memorandum to Westby of this conversation, he concluded:
 
 
 94
 '* * * It seems to me that Offshore Navigation is a direct competitor to us, the Hastings patent situation is no better than it was, and the Hastings Company would acquire the major interest due to equipment sales to the X-Corporation in any event. It is still entirely possible that SSC could obtain an exclusive patent position in the survey field even operating in competition with a Hastings-Offshore Navigation enterprise.
 
 
 95
 'In view of the interest of Offshore Navigation in the Hastings system, I did not feel it was advisable to definitely cancel negotiations with the Hastings Company at this time, but I advised Mr. Hastings I would discuss this with you immediately and we would telephone him Monday to discuss this matter further.'
 
 
 96
 Thereafter, one week later on August 7, Westby called Hastings and reformulated the plans for the joint-corporation suggesting to Hastings that no stock should be issued to any large oil company but that Seismograph and Hastings Instrument Company should benefit solely from any profits. Westby then asked Hastings about Hastings' ability to make a ranging demonstration to measure distance on the coast for one of Seismograph's clients and Hastings answered that one week would be sufficient. They then altered the plans so as to hold the demonstration in the Chesapeake Bay with Hastings to write Westby a detailed description about the demonstration. The conversation then turned into discussing the accuracy of Raydist and Hastings suggested the possibility of a three-way joint corporation with Offshore as the third party. Westby immediately censured this idea. Hastings next stated that he told Offshore that he would tell them one way or the other by August 14 and that Offshore was willing to accept a non-exclusive license. Westby then suggested that, if Hastings were to deal with Offshore, he should make them a 'tougher deal than we're considering together-- that X company will be able to offer the services for, so that we'll have a better competitive position in the event that we do go together * * * (then) there isn't any question but what your position in the X company is improved.' Thus, the conversation between Westby and Hastings ended with Hastings being deluded about the X-corporation and also under the duty to plan a detailed demonstration for Seismograph. In connection with this fictitious demonstration, Hintze of Phillips Petroleum testified:
 
 
 97
 'Q. At any time in the summer of 1947 after the Snow and Piety visit to view the demonstration, did you ever request Seismograph to arrange another demonstration of Raydist? A. I cannot remember doing that, making any such request.
 
 
 98
 'Q. We have had previous testimony in this case by Dr. Hawkins of Seismograph that to his belief you wanted another demonstration of Raydist. A. I have no recollection of any such arrangement.
 
 
 99
 'Q. That was around September of 1947. A. I don't remember anything about it. In any case, I don't see why I would have wanted it. We were very well satisfied with what we had seen, and I wouldn't see any reason why we would have wanted one.'
 
 
 100
 Following the mandates of Westby, Hastings forwarded to him on August 15 a detailed analysis of the proposed demonstration and suggested that the demonstration be held on Friday, August 29.
 
 
 101
 On August 25, Mason brought Hawkins up-to-date on the Honore situation, telling him about Bailey's eliciting the information from Timbie, stating, 'it appears that the Honore papteny is definitely the patent in which they are interested.' Mason said that he is helping John Carlson (Seismograph's general counsel) locate Honore in France.
 
 
 102
 On August 27 (two days before the scheduled demonstration) Westby called Hastings and postponed the demonstration until the 8th of September. Again, this conversation ended with a discussion about X-corporation and about how long it would take to have the Raydist system in full operation on the coast. On the 4th of September, Westby wired Hastings that the demonstration was delayed and 'will inform you later suitable date.'
 
 
 103
 In the meanwhile, on August 28 Carlson had explained the Honore situation to a London officer of Seismograph, E.J.P. van der Linden, with the instructions for his to negotiate directly with Honore. On the 5th of September Westby cabled van der Linden to rush Honore negotiations.
 
 
 104
 From the 19th of September until the middle of October, Seismograph's officer, van der Linden, preliminarily negotiated with Honore, receiving instructions and suggestions from Westby, Carlson, Manhart, and Hawkins. The meeting date was set on about the 13th of October. Hawkins, who was to be in Europe on other business, joined van der Linden on the 10th of October and met with Honore from October 13 to 21st. The final contract between Seismograph and Honore was signed on October 28.
 
 
 105
 At the inception of the Honore negotiations, Honore, in answering a letter from van der Linden of September 18, requested from van der Linden:
 
 
 106
 'The fact that I have received a short while ago a similar proposition from another American Company, with respect to the same patent which is already old, makes me think that your Patent Company is in relation with that other Company, and that it is these relations which has brought you to correspond with me.
 
 
 107
 'Before starting any discussion with you, I would like to know if that hypothesis is exact, and in that case to know the relative position of your Patent Company, and that other Company.' vad der Linden wrote Westby about the above request, saying, 'I have not had time to think much about this question, and at the moment I am at a loss about what is to be done. I am writing this immediately in the hope that you will send me instructions by the time Hawkins is in London.'
 
 
 108
 It is interesting to note how van der Linden and Hawkins answered the above request of Honoer's, as quoted from Hawkins' memorandum of the Paris negotiations:
 
 
 109
 'We started negotiations, Mon. morning, Oct. 13, by answering the question in their letter to van of Oct. 2 as to whether the parent Co. of SSL might have been interested in their system and inquired from the U.S.A., by informing them that we knew of a Hastings Instrument Co.; that we had had very general preliminary negotiations with the H.I. Co. but had broken these off when we felt that there was little to be gained due to their limited facilities and development. They confirmed by their exclamations that it was the H.I. Co., that had been contacting them. Mason's guess was correct. Hastings was after an exclusive license under the Honore patent as of at least May 1947'.
 
 
 110
 It is also of interest to note Seismograph's exuberance in 'beating Hastings to the Honore Patent' and its utmost caution to completely exclude Hastings from all considerations, as noted in the margin.[7] Furthermore, Seismograph had completely disregarded and evaded Hastings during the negotiations with Honore. After Seismograph's last postponement of the fake demonstration on the 4th of September, it never contacted Hastings again nor did it ever so much as drop a subtle hint to Hastings that their bargainings had terminated. During this period, Hastings' office memoranda indicated that he tried in vain on several occasions to contact Hawkins, Westby, and Manhart in Tulsa.
 
 
 111
 Following Seismograph's acquisition of its interest in the Honore patent, Hastings still attempted to negotiate with Honore only to learn on February 27, 1948, that Honore had licensed its interest to others. In November 1947, Hastings affirmatively entered into negotiations with Frost Geophysical Corporation and later with Offshore.
 
 
 112
 In conclusion, it is evident that throughout their relationship Seismograph was playing a 'cat and mouse' game with Hastings. Since Dr. Hawkins described his conduct as 'clean, hard, play' and declared he and his company would repeat their performance, if given an opportunity, saying he spoke for his company in so declaring, we can only conclude that he as an officer of Seismograph, has erroneous concepts of fair play in business morals and ethics. Beyond a reasonable doubt (which is a much higher standard than our review of facts found by trial judges), the evidence here shows that Seismograph led Hastings through a tortuous path laden with deception, knavery, and misrepresentation. Not once throughout their entire relationship did Seismograph 'play it straight' with Hastings. And, on the other hand, Hastings divulged nearly everything of importance and confidence to Seismograph with even an approach to naivete. The only information not disclosed to Seismograph was that of the name of the Honore patent, but Hastings even told to Seismograph 'that his attorney had advised him not to reveal the heterodyne patent that they were aware of.' Even when Mason advised strongly against any negotiations with the Hastings Instrument Company during the middle of May, Seismograph led Hastings on and attempted to elicit information from him; even when Seismograph had a written office memorandum in late July rejecting the Hastings proposal, its officers upon many occasions deceived Hastings and deluded him into planning for fictitious demonstrations and contracts and organizations which were purely fanciful conceivances by Hawkins and Westby.
 
 
 113
 With the intendments of the facts thus outlined, appellant strongly urges that the trial court erred in several particulars. We will discuss these assignments of error briefly.
 
 
 114
 First, appellant says that the evidence shows that the trial judge's dismissal of the complaint on the equitable doctrine of unclean hands was clearly erroneous and would warrant reversal under Rule 52(b), Federal Rules of Civil Procedure. Enough has been said on this point. It is utterly without merit. Determinations as to what constitutes unclean hands and inequitable conduct are to be made in the sound judgment and conscience of the court of equity.
 
 
 115
 Second, appellant states that the trial judge erred, as a matter of law, in imposing a constructive trust in favor of Hastings Instrument Company, because the information on Raydist conveyed by Hastings to Phillips Petroleum and then to Seismograph on May 3, 1947, was not confidential nor a disclosure of trade secrets. For future operations this question is moot. The trial court did impose a constructive trust in favor of Hastings on the Honore patent, but that patent has now expired and the appellant did not appeal from the issue of its validity. Appellee also sought a constructive trust on the Hawkins patent in suit, but since that patent was held invalid the constructive trust was never imposed.
 
 
 116
 Third, appellant urges that Claims 2 and 14 of the Hawkins patent in suit, which is a combination patent, was not invalid because of obvious lack of inventiveness and lack of novelty, and that the trial court erred in so holding. The appellant concedes that all the matter contained in Claims 2 and 14 was known in the prior art except that of combining the multiple modulations principle with a doubled Honore system.[8] The trial judge held that this combination was unpatentable because Hawkins was not the real inventor and because this combination lacked inventiveness. We affirm his holding, as quoted in the margin,[9] as fully supported by the evidence.
 
 
 117
 Fourth, Seismograph moved the trial court to vacate its judgment on the grounds of fraud upon the court, alleging that Hastings intentionally suppressed a document relating to dealings with the National Geophysical Company during the late summer of 1947. The trial court held that this allegation was unsupported by the evidence in that there was no intent to suppress, that this 'newly discovered evidence is not such as would 'probably change the result if a new trial is granted," and that laches of three years and the policy of ending litigation both came into play. We fully agree with the trial court's rulings. The trial court did not abuse its discretion in refusing to give relief from its judgment under Rule 60(b), Federal Rules of Civil Procedure. As we have heretofore stated, such a motion is 'a matter normally beyond appellate review,' Saskatchewan Government Ins. Office v. Spot Pack, 5 Cir., 1957, 242 F.2d 385, 386, and may be reviewed only for abuse of such discretion. See Elgin National Watch Co. v. Barrett, 5 Cir., 1954, 213 F.2d 776, 780; Independence Lead Mines Co. v. Kingsburg Co., 9 Cir., 1949, 175 F.2d 983, 988.
 
 
 118
 Hastings also specifies several assignments of error in its cross-appeal which are not seriously pressed.[10] Cross-appellant does insist, however, 'that defendant Hastings should not be required to bear the expense of this litigation, should recover damages and Seismograph's profits, and should be protected against any future suits by an injunction or the grant of a license under all applicable patent rights, both domestic and foreign, which have been acquired by Seismograph * * *.' Therefore, we see that appellee-Hastings on his cross-appeal prays for inter alia (1) a permanent injunction against Seismograph, (2) an accounting and monetary award, and (3) an assessment of costs and attorney fees against Seismograph.
 
 
 119
 We affirm the trial judge's refusal to award damages to Hastings Instrument Company.
 
 
 120
 The evidence shows that as of the year of the trial (1954), Seismograph had acquired a total of thirty-nine U.S. and foreign patents relating to radio navigation in general and many of which pertained exclusively to the 'hyperbolic two-dimensional heterodyne phase comparison fixed transmitter type system' kin to the system in suit. Of course, the validity of these patents was not, nor could it be, passed on by the district court. However, appellee's counsel insists that: 'While any suit brought against Hastings in the United States on any of these U.S. patents owned by Seismograph would be dismissed for unclean hands, the defendant Hastings can ill afford to bear the expense of any further litigation.' While we must deny for the present such relief to the cross-appellant as a permanent injunction restraining Seismograph, we will direct the district court to modify the decree so as to provide, at the foot thereof, that the cross-appellant or its privies are granted permission, if further aggrieved, to file a supplemental cross-complaint in this case against Seismograph or its privies, presenting for the court's consideration any future suit by Seismograph or its privies against Hastings Instrument Company, Inc., or any users of equipment of that company's in any fields of use, on all patent rights, both domestic and foreign, owned and controlled by Seismograph Service Corporation which embody information or trade secrets improperly acquired form Hastings Instrument Company, Inc., or Charles E. Hastings.
 
 
 121
 It seems to us that the present litigation is so vexatious and unjustified as to constitute an 'exceptional case' within the meaning of 35 U.S.C.A. 285, if that section is ever to be accorded a field of operation, and that the District Court clearly erred[11] and was too charitable to Seismograph in not so holding. We hold, therefore, that court costs and reasonable attorney fees for the appellee should be awarded for both this appeal and for the trial in the District Court, the fees to be awarded by the District Court.[12]
 
 
 122
 The judgment in No. 16,067 is reversed in part and the cause remanded for the issuance of an appropriate note to the foot of the decree and for the awarding of attorneys' fees and costs, as directed in this opinion. In all other respects the judgments are
 
 
 123
 Affirmed.
 
 
 124
 On Petition for Rehearing.
 
 
 125
 PER CURIAM.
 
 
 126
 The petition for rehearing was denied on December 9, 1958, and that action remains unchanged. The opinion accompanying such denial is, however, withdrawn and the following substituted in lieu thereof:
 
 
 127
 Appellant requests a reconsideration of certain inquires which influenced this Court's findings that Seismograph was 'playing 'a cat and mouse' game with Hastings' which we characterized as 'laden with deception, knavery, and misrepresentation.' We have carefully reconsidered such inquiries,[13] and our views remain unchanged.
 
 
 128
 Appellant points out several technical errors appearing in this Court's opinion which should, for the purpose of accuracy, be corrected. These technical errors appear in paragraphs beginning on page 10 and continuing through pages 11, 12, and 13 of the original slip opinion (263 F.2d 10, 11), which read as follows:
 
 
 129
 'On April 28, Dr. Piety and Dr. R. D. Snow (Phillips' patent technician) visited Hastings at his office in Hampton, Virginia, and there were given a demonstration of a Raydist two-dimensional system which consisted of two fixed transmitters with the receiving set in a moving auto. The experiment was completely successful, the automobile being tracked within the accuracy of a few feet. An office memorandum by Piety and Snow about this visit stated that Raydist was the answer to their problem; that, heretofore, Hastings had concerned himself with tracking aircraft (with the airplane containing the transmitter as described in Bulletin R-19), but by using fixed transmitter stations, a large area of water could be surveyed accurately; that Hastings was a small company; that Hastings had had one patent application refused and now had one ready to file; and recommended that Phillips should negotiate to buy one surveying outfit and order others. This memorandum shows that Hastings gave vital, technical, patent, and business information to Phillips upon solicitation by Phillips.
 
 
 130
 'Four days after this visit (May 2), Phillips Petroleum decided in a conference that since all of Phillips' geophysical prospecting work was being handled by Seismograph, 'if Phillips were to buy a Raydist installation, it would very probably be turned over to the Seismograph Service Company * * * (and) that Seismograph Service Company be advised of the Raydist method and of Phillips' interest in the use of such a method and apparatus and if Seismograph Service Company is interested they should then negotiate directly with Hastings Instrument Company.' On the day after this decision, Piety and Hintze (head of geophysical exploration of Phillips) visited the office of Seismograph in Tulsa, Oklahoma, and discussed the Raydist system with G. H. Westby (President of Seismograph) and Dr. J. E. Hawkins (vice-president in charge of research and development).
 
 
 131
 'The evidence is conflicting as to the extent and scope of information about Raydist which was divulged to Westby and Hawkins by Phillips' officers. Dr. Hawkins emphatically insisted that the discussion was limited to Hastings' 'demonstration of the heterodyne principle of a single-dimensional system' where a moving transmitter was moved between two fixed receiving stations * * *,' which was the system discussed in Bulletin R-19. But the preponderance of other evidence indicates, as the trial court found, that Phillips' officers divulged and discussed the two-dimensional fixed transmitter system which was the basis of Hastings' demonstration, and which is the heart of the 'idea' in this case. Piety's testimony corroborated this finding when he stated that, 'Everything that would have been of interest to them (Seismograph) or pertinent to a description of the system would have been given to them' and further stated, 'We described the demonstration.'
 
 
 132
 'About the same time, May 5th, Hastings' patent counsel in Washington had determined that the Honore patent No. 2,148,267 would be infringed by Raydist, and was attempting to locate the whereabouts of Honore so as to obtain either a license or an assignment of his patent.
 
 
 133
 'Within seven days after learning of the potentialities of the two-dimensional fixed transmitter system in the heterodyne principle, explained to him by Piety and Hintze, Dr. Hawkins on May 11th roughly designed and demonstrated a two-dimensional fixed transmitter system. This design and demonstration was generally the same as the demonstration performed by Hastings for the Phillips officers and relayed to Hawkins. By the next day (May 12th), Hawkins sketched these discoveries and several variations thereof and had them notarized and on May 13th sent them with an explanatory letter to Richard D. Mason, Seismograph's patent counsel in Chicago, for him to determine patentability. It is interesting to note that one of these disclosures was the same as the Honore patent (the single-dimensional system), and one disclosure was a sketch of a two-dimensional system using three transmitters which was substantially the design of the fixed transmitter system demonstrated to Piety and Snow by Hastings. In this special delivery letter to Mason, Hawkins stated:
 
 
 134
 "I am enclosing five disclosures relative to position determination by means of the heterodyne principle. If you will docket these as you suggested and study them over, we will get together as to what we will do with them after our visit to the Hastings people in Washington."
 
 We modify those paragraphs to read:
 
 135
 'On April 28, Dr. Piety and Dr. R. D. Snow (Phillips' patent technician) visited Hastings at his office in Hampton, Virginia, and there were given a demonstration of a Raydist fixed transmitter system which consisted of 'small portable radio transmission stations at each of two points exactly a mile apart, along the shoulder of an arterial highway. A relay station, with F.M. transmitter, was located at an intermediate point. A station wagon in which the recording station was mounted was driven down the highway between the two transmitters.' The experiment was completely successful, the automobile being tracked within the accuracy of a few feet. An office memorandum by Piety and Snow about this visit stated that Raydist was the answer to their problem; that, heretofore, Hastings had concerned himself with tracking aircraft (with the airplane containing the transmitter as described in Bulletin R-19), but by using fixed transmitter stations, a large area of water could be surveyed accurately; that Hastings was a small company; that Hastings had had one patent application refused and now had one ready to file; and recommended that Phillips should negotiate to buy one surveying outfit and order others. This memorandum also indicates that Phillips' representatives and Hastings undoubtedly discussed the application of a two-dimensional fixed transmitter system to Phillips Gulf Coast Operations, stating:
 
 
 136
 "* * *. The apparatus for Raydist would be much cheaper than that of Decca. In using either Raydist or Decca or Shoran, one would probably set up three radio transmitter stations up to forty miles apart along the shore. The area out in front of the three stations could then be surveyed very accurately. Each pair of radio transmission stations would be the foci of a system of hyperbolas. The dial on the servo unit of the Raydist recording station would indicate the location as a function of the intersection of an hyperbola of each system * * *.' This memorandum shows that Hastings gave vital, technical, patent, and business information to Phillips upon solicitation by Phillips.
 
 
 137
 'Four days after this visit (May 2), Phillips Petroleum decided in a conference that since all of Phillips' geophysical prospecting work was being handled by Seismograph and Petty Geophysical Engineering Company, 'if Phillips were to buy a Raydist installation, it would very probably be turned over to the Seismograph Service Company or Petty for the (and) that Seismograph Service Company be advised of the Raydist method and of Phillips' interest in the use of such a method and apparatus and if Seismograph Service Company is interested they could then negotiate directly with Hastings Instrument Company. As geophysical prospecting work is maintained in the highest possible secrecy, Phillips could not hope to exploit the use of Raydist in survey work for other companies.' On the day after his decision, Piety and Hintze (head of geophysical exploration of Phillips) visited the office of Seismograph in Tulsa, Oklahoma, and discussed the Raydist system with G. H. Westby (President of Seismograph) and Dr. J. E. Hawkins (vice-president in charge of research and development).
 
 
 138
 'The evidence is conflicting as to the extent and scope of information about Raydist which was divulged to Westby and Hawkins by Phillips' officers. Dr. Hawkins emphatically insisted that the discussion was limited to Hastings' 'demonstration of the heterodyne principle of a single-dimensional system where a moving transmitter was moved between two fixed receiving stations * * *,' which was the system discussed in Bulletin R-19. But the preponderance of other evidence indicates, as the trial court found, that Phillips' officers divulged and discussed a fixed transmitter system which was the basis of Hastings' demonstration, and which is the heart of the 'idea' in this case. Piety's testimony corroborated this finding when he stated that, 'Everything that would have been of interest to them (Seismograph) or pertinent to a description of the system would have been given to them' and further stated, 'We described the demonstration.'
 
 
 139
 'About this same time, May 5th, Hastings' patent counsel in Washington had determined that the Honore patent No. 2,148,267 would be infringed by Raydist, and was attempting to locate the whereabouts of Honore so as to obtain either a license or an assignment of his patent.
 
 
 140
 'Within seven days after learning of the potentialities of the fixed transmitter system in the heterodyne principle, explained to him by Piety and Hintze, Dr. Hawkins on May 11th roughly designed and demonstrated a fixed transmitter system which was generally the same as the demonstration performed by Hastings for the Phillips officers and relayed to Hawkins. By the next day (May 12th), Hawkins sketched these discoveries and several variations thereof and had them notarized and on May 13th sent them with an explanatory letter to Richard D. Mason, Seismograph's patent counsel in Chicago, for him to determine patentability. It is interesting to note that one of these disclosures was the same as the Honore patent (the single-dimensional system), and one disclosure was a sketch of a two-dimensional system using three fixed transmitters which was substantially the system discussed in the office memorandum of Piety and Snow made concerning their visit to Hastings. In this special delivery letter to Mason, Hawkins stated:
 
 
 141
 "I am enclosing five disclosures relative to position determination by means of the heterodyne principle. If you will docket these as you suggested and study them over, we will get together as to what we will do with them after our visit to the Hastings people in Washington."
 
 
 142
 Appellant forcefully urges that, 'it is to be noted that in this case of first impression in this Circuit the panel rendering the decision has laid down standards of business morals and ethics as a matter of equity jurisprudence where no equitable relationship between the parties was found to exist. The decision imposes obligations, existent only in confidential relationships, upon parties dealing wholly at arms' length, and thus hold serious implications in its disregard for this basic distinction in adjudging the business conduct of such parties.' We felt that appellants' conduct in its business dealings with Hastings Instrument Company was so flagrantly inequitable as not to require legal citations, and that the principles and authorities had been amply discussed in paragraphs editorially numbered 14 through 18 of the district court's opinion, as found in D.C., 135 F.Supp. 342, 354-355, with which discussion we agree.
 
 
 143
 Appellant insists that the part of this decision reversing the District Court's denial of attorneys' fees is in direct conflict with the holding in Graham v. Jeoffroy Mfg., Inc., 5 Cir., 1958, 253 F.2d 72, 78. That case was carefully considered in connection with our original opinion and was cited in footnote 11 thereto. It does not conflict with our present decision. One purpose of authorizing the court in exceptional cases to award reasonable attorneys' fees to the prevailing party[14] is 'to enable the court to prevent a gross injustice to an alleged infringer.'[15] This vexatious and unjustified litigation required appellees to incur liability for considerable attorneys' fees. There could hardly be an instance of a more gross injustice to an alleged infringer. Even under the strict rule of Graham v. Jeoffroy Mfg., Inc., supra, the District Court clearly erred in refusing to award reasonable attorneys' fees to the appellees.
 
 
 144
 The petition for rehearing is therefore denied.
 
 
 145
 On Second Petition for Rehearing.
 
 
 146
 PER CURIAM.
 
 
 147
 The Court granted Seismograph Service Corporation leave to file a second petition for rehearing in the above styled and numbered causes. The same having been carefully considered, it is hereby denied.
 
 
 
 [1]
 Reported as Seismograph Service Corporation, v. Offshore Raydist, Inc., D.C., 135 F.Supp. 342-356
 
 
 [2]
 Charles E. Hastings-- officer and principal stockholder in the Hastings Instrument Company, Inc
 Dr. J. E. Hawkins-- Vice-president of Seismograph, in charge of research and development.
 G. H. Westby-- President of Seismograph.
 T. A. Manhart-- Executive Vice-president of Seismograph.
 Richard D. Mason-- Seismograph's patent counsel.
 John S. Carlson-- Seismograph's general counsel.
 E. J. P. van der Linden-- Seismograph's London officer.
 
 
 [3]
 An excellent discussion of the heterodyne phase comparison principle is found in footnote 1 of the District Court's opinion, 135 F.Supp. 342, 344. However, the appellant's brief contains an excellent statement of the technical background necessary to understand the heterodyne principle in suit. We quote from pages 4-8 of its primary brief:
 '* * * It is known that radio waves, as they travel outward from a transmitting antenna, form a pattern, in a given plane, somewhat like that which is formed on the surface of the water when a rock is dropped in a pond. The pattern is one of concentric circles marking the crests and troughs of waves extending outwardly from the source * * *. When two radio waves transmitted from physically separated sources meet each other in space at the instant when each is at a crest or trough, or when each is at the same relative position between crest and trough, they are deemed to be 'in phase' with each other at the meeting point. If one is at crest and the other in trough, they are 180 degrees 'out of phase.' Any lesser or greater degree of variance in the crest-to-crest relationship is similarly measured in degrees of phase angle.
 'When transmissions of two radio waves from geographically separated sources are concurrently present in the same area or broadcast field, the lines connecting the points throughout the broadcast field at which these waves are 'in phase' are hyperbolic in contour, with the points of wave transmissions being the foci of all such lines * * *. These hyperbolic lines are commonly called equiphase lines or isophase lines. With these hyperbolic isophase lines existing in space in known fixed positions they constitute reference lines, so that a mobile craft, such as a boat, equipped with receivers for receiving the transmitted radio waves and a phase measuring device can be moved in such a manner that the phase measuring device counts the lines which are crossed in moving from one position to another and further indicates the position of the craft between two adjacent equiphase lines. Similarly, if the phase measuring device is stationary and one of the transmitters is moved with the mobile craft, a like result is obtained. As long as the object is moved along or parallel with such a hyperbolic line, there is no change of reading in the phase measuring device.
 'The system thus far described is designated as 'single dimensional' in that it gives only a line of position, somewhat like the orbit of an object traveling around a point. To obtain a 'fix' at any particular point at any instant, it is necessary to provide similar means for establishing a line of position from another arrangement of transmitters and receivers to intersect that of the first. The combined system is then referred to as 'two-dimensional.' The operating principles are the same whether one transmitter is moved with respect to the other transmitters and the receivers are held stationary or whether the receivers are moved with respect to all of the transmitters. Where a transmitter is moved with the moving object, the system is referred to as a 'moving transmitter system.' Where the transmitters are located at points fixed with respect to each other and the receivers are in the moving object, the system is referred to as a 'fixed transmitter system.'
 'Either of these types of systems may be employed as geographical survey systems. The difference between these two types of systems is that only one user can operate at a time in the 'moving transmitter' system because each user requires a separate set of transmitters which only he can use, while any number of users can operate in the 'fixed transmitter' system where only the reception of the wave transmissions on the moving object is involved. These systems, whether of the fixed or moving transmitter type, are generically termed 'continuous wave, hyperbolic, phase comparison systems.'
 'One of the primary problems in operating these systems is that of maintaining a high degree of phase synchronization in the transmission of the radio frequency waves. A fixed transmitter system of the continuous wave, two-dimensional, phase comparison type, referred to as the Decca system * * * and known to both Appellant and Appellees prior to any of the events material to this case utilizes transmitters having output frequencies mathematically related to each other in order to obtain the synchronization necessary to maintain the required degree of stability of the equiphase hyperbolic pattern. The Decca system, in its requirement for additional equipment and related frequencies, presented problems of expense in operation and of difficulty in obtaining frequency allocations from the Federal Communications Commission.
 'The Honore patent discloses a system in which two wave transmissions are 'heterodyned' or mixed in order to obtain a low frequency signal equal to the difference between the frequencies of such transmissions, which low frequency signal carries the combined phase characteristics of the two original transmissions. When the heterodyning of the two waves or transmitted signals takes place at a fixed point, the only variations in phase of the resulting difference frequency signal are those produced by the inconstancy of the generation of the transmitted signals. This resulting difference frequency signal is known as the 'reference' signal. Meanwhile, when the same two transmissions are heterodyned at a moving point, the phase of the resulting difference frequency signal will reflect the identical variations due to inconstancy, plus those which result from the change of position of the moving point relative to the sources of signal transmission. This difference frequency signal developed at the moving point is known as the 'position' signal. The 'reference' signal may b transmitted to the moving point and when phase compared by a phase measuring device with the 'position' signal, the inconstancy variations common to both cancel out and only the desired position information remains. This is the 'heterodyne principle' upon which both the Lorac and the Raydist systems are based, and by means of which the problem of synchronization is resolved without the requirements of the less desirable features of the Decca system. The Honore patent diclosed and basically covered the application of the heterodyne principle to a hyperbolic radio navigation system of the continuous wave phase comparison type. His patent disclosed only a single-dimensional fixed transmitter type system.'
 
 
 [4]
 The above quoted statement from Manhart's memorandum seems to be diametrically opposite to Manhart's answers in a deposition where he testified that the principal reason for his visit to Hastings was to purchase equipment. He stated:
 'Q. I mean that the question should mean: What was the intention of Seismograph originally? A. (Manhart) When we contacted Hastings?
 'Q. Yes. A. I believe the principal objective at that time was to gain time. We needed the service today and not six months from now. My recollection of instructions when I went down there was to attempt to make some reasonable arrangement with him for the use of his receivers, his receiving combinations. That was the basis of proceeding, on the theory that there was room enough for everyone if we could get in the field early: That is my recollection of it.
 'Q. Then as far as you were concerned, it was not your intention when you went to Hampton, and it was not your objective, to get information and then set up a patent position which would make it difficult or impossible for Hastings to operate in this field? A. I think I could be a little broader than that. It was not the company's objective to do that.'
 
 
 [5]
 The Honore Patent was not mentioned in a letter to Hawkins of June 9 which listed patents of interest, nor was it mentioned in Mason's notes of June 2-6, nor was a copy of the Honore-Patent ordered with those patents pertinent on this problem on the 5th and 9th of June from Bonini
 
 
 [6]
 It is interesting to note the method used by Bailey in his approach to Timbie as shown in the following excerpts from Bailey's letter:
 'In discussing with Mr. Timbie a search on which I have been working which involves a principle akin to the above-mentioned heterodyning feature, I asked him whether he thought there would be anything to gain by searching the navigation art. After discussing some of the pros and cons, he said that he had been through this art just a few days ago and did not think there was anything close there. As I was about to leave, I asked him again if he thought the navigation art had anything to offer, and he said: 'There is a patent to Honore which shows three transmitters, one of which broadcasts the beat note between the other two * * *,' and he went on to describe the Honore patent.
 'It would seem from the above that the Honore patent is the one for which Hastings is negotiating and that they have been making a validity search on this patent within the last week or so. The basis for this conclusion is that Mr. Timbie would be most likely to remember and quote the patent on which he was conducting the search rather than any secondary reference. In any event, it establishes the fact that Hastings is aware of the Honore patent.'
 
 
 [7]
 Hawkins' memorandum notes of October 17 covering the negotiations with Honore state in part:
 'In furthering our cause and the possibility of our becoming their desired USA connection we mentioned our connection with the Phillips Co. and the possibilities that finances might be found in this direction for large scale developments in the navigational field especially in view of the fact that Phillips had contacted Hastings and turned the results of their investigation over to us.
 'This was a lucky stab since they then showed us a letter from Hastings stating that two large Cos. were interested in the development.
 "Phillips and SSC-?"
 '* * * Furthermore they are as well aware of its value as we-- if not more so. The fact that Hastings had made them an offer made it almost imperative that we reach an agreement in order to be safe in our development program.'
 In Hawkins' 'Memo re Hastings' of October 17, he concluded:
 'We read (van & I) most of the Hastings-Honore correspondence-- after we reached an agreement in principle but before we had reached a final agreement. We do not believe Hastings had mentioned the geophysical field although hd did mention that two large Cos. were interested in using the system. It is logical to suppose that the next proposal might be for a license in the geophysical field.
 'Hastings' French Attorney had spent considerable time locating Honore, and Mr. Mason's original guess was entirely correct, this was the important patent that Hastings was after.'
 In Hawkins' letter to Westby of October 19, he stated:
 'Van did a marvelous job of negotiating an agreement and I firmly believe it would have been impossible for an American to have reached as satisfactory an agreement (if any) through a French attorney. We were further ahead in two hours than Hastings was after 6 months.'
 'P.S. I am also enclosing a memo on the Hastings negotiations with Honore-- at least all I can remember from the conversation and the letters they showed us.'
 In Hawkins' letter to Mason of October 19, he stated:
 'As the enclosed memo will show-- your suspicions re Mr. Hastings were entirely correct. He first got in contact with Honore in May and I think we are just lucky that an agreement hadn't been reached. Also had we entered into an agreement with Hastings we would have been out on a limb. Our Phillips patent friends evidently were far from the picture too, as a result of Hastings comments. I'm certainly glad now that we got all this information ourselves because it leaves us clear with respect to Hastings.'
 In Hawkins' letter to Westby of October 21, he continued:
 'There is only one possibility that worries me re the patent position-- if Hastings were to get wind of this agreement before the Attorney General releases the patent to Honore he might try to block the release-- the fact that some equipment has been supplied to the Army & Navy might be a pretty strong lever. If thru some such means he managed to secure a non-exclusive license it would effect our position markedly. This has been taken care of as far as the agreement is concerned but it would be better not to have it happen. Honore is not advising Hastings of us at present so it is safe from this end.
 'I think we should now approach the FCC for licensing-- pointing out the general means by which we mean to operate our system but avoiding reference to the Hastings system and particularly to the Honore patent at this time-- until we have the situation more firmly under control. We can most certainly show them our proposed station arrangement and filtering & switching system to eliminate stations-- making a point that it is covered by patent application.
 'It could even be well to have an additional check made if there is any possibility of any license being obtained (for U.S. Gov't use or otherwise). Thru the Attorney General with the expressed permission of Mr. Honore-- just as a sort of insurance. Of course we should at the same time be on our guard against the Offshore Navigation Co. getting into this thing prematurely with Hastings and putting us in an embarrassing position with our clients.'
 
 
 [8]
 Appellant's brief states: The Hawkins patent 'is specific to a two-dimensional heterodyne phase comparison system in which three spaced transmitters are heterodyned in pairs to produce two reference signals, and in which the reference signals are modulated on a common carrier for transmission to a receiving point.'
 The testimony of the appellant's expert witness Kelley on novelty was:
 'The Court: I have one question. What is the novelty of the Hawkins Patent not covered by prior art?
 'The Witness: The novelty of the Hawkins Patent which is not covered by the prior art as I view it, Your Honor, is this. The prior art is distinctly Honore directly. I view this as an improvement of the Honore Patent, and in regard to the Honore Patent which, as we have explained, is a one-dimensional type of system fundamentally, the step in going from one-dimensional type of system to a two-dimensional type of system obviously involves the additional apparatus, and what I see Hawkins has accomplished in that improvement, is that he has retained all of the functions necessary for the two-dimensional systems, and at the same time has eliminated one of the relay stations.
 'In other words, if you take two Honore systems, you would have to relay--
 'The Court: In other words, what you are saying is that it is a mechancial improvement. What is inventive about it?
 'The Witness: I don't know if I could really explain what is inventive, except that it is my understanding that where a function is retained with the elimination of a-- of what was priorly a necessary apparatus-- I hope I'm not overstepping my bounds-- is regarded as an inventive step.'
 
 
 [9]
 'With reference to the Hawkins patent in suit, a different result must be reached. In the first place, Hawkins was not the inventor thereof. Alexander Milburn Co. v. Davis-Bournonville Co., 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651; 35 U.S.C. 102(f). It was Hastings who conceived the idea of a double Honore system using only three spaced transmitters. This idea was conveyed to the Phillips representatives and by them to Hawkins, who appropriated it as his own. As to that part of Claims 2 and 14 which relates to a means for modulating multiple beat frequency signals upon a common carrier, that, too, was described by Hastings, in 1946, in his application of his Raydist system to the angles of pitch and roll in airplanes or guided missiles, long before the Hawkins patent was applied for. Hastings made no claim to have invented multiple modulation. As an electronic engineer, he was familiar with the process. So was Hawkins. Apparently it was unfamiliar to Hawkins' patent counsel, so he had it patented. That the idea of modulating multiple audible frequencies on a common carrier was not new to workers in the art is shown by the Patent Office records. It was disclosed at the time, not only in the radio navigation art, but in related arts as well. Applying an idea from an analogous art is not invention. Powers-Kennedy Contracting Corporation v. Concrete Mixing & Conveying Co., 282 U.S. 175, 51 S.Ct. 95, 75 L.Ed. 278; Utah Radio Products Co. v. General Motors Corp., 2 Cir., 106 F.2d 5. To recognize a patent for this minuscule contribution, which Hawkins did not make, to the promotion of 'the Progress of Science and useful Arts' would 'lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the arts.' Atlantic Works v. Brady, supra, 107 U.S. (192), at page 200, 2 S.Ct. (225), at page 231 (27 L.Ed. 438).' Seismograph Service Corp. v. Offshore Raydist, 135 F.Supp. 342, 352, 353
 
 
 [10]
 Appellee stated that the cross-appeal would never have been taken if the main appeal had not been pressed. It stated:
 '* * * After plaintiff had filed its notice of appeal, the defendants, seeing that this vexatious litigation was to be continued, cross appealed only from that part of the judgment of the District Court which denied more affirmative relief for which defendants had prayed.' Appellee also took the logical position that:
 'With respect to defendants' right to further affirmative relief in the form of assignment of the patent rights, it should be noted that while each of the defendants originally pleaded that the patents in suit were held in trust for Hastings, and that Hastings' answer prayed an assignment thereof, this question is moot on appeal. The Honore patent has expired. The Hawkins patent is invalid, and moreover, the defendants have accepted the District Court's grant of a non-exclusive license under the Hawkins patent (if it be held valid) and have not listed the Court's failure to order an assignment thereof to Hastings in their Specification of Errors.'
 
 
 [11]
 Graham v. Jeoffroy Mfg., Inc., 5 Cir., 1958, 253 F.2d 72, 78
 
 
 [12]
 Blanc v. Spartan Tool Co., 7 Cir., 1948, 168 F.2d 296, 300; cf. American Chain & Cable Co. v. Rochester Ropes, 4 Cir., 1952, 199 F.2d 325, 330. See also United States, for Use and Benefit of Caldwell Foundry & Mach. Co. v. Texas Construction Co., 5 Cir., 1955, 237 F.2d 705, 707; Henderson v. Avondale Marine Ways, 5 Cir., 1953, 205 F.2d 518
 
 
 [13]
 'A. What is the significance of Seismograph's receipt of information from Phillips?
 'B. What ethical or equitable duty did Seismograph violate by not 'reciprocating the good faith disclosures of Hastings'?
 'C. What obligation did Seismograph have to advise Hastings of its decision to proceed independently?
 'D. By reason of what relationship with Hastings was Seismograph obligated to refrain from acquiring the Honore rights when it received knowledge of Hastings' interest in them?'
 
 
 [14]
 35 U.S.C.A. 285
 
 
 [15]
 Senate Report No. 1503, U.S.Code Cong. Serv. at page 1387